**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SPEECH FIRST, INC.<br><br>        *Plaintiff,*<br><br>v.<br><br>KAYSE SHRUM, in her individual capacity and official capacity as President of Oklahoma State University; ALEIGHA MARIOTT, in her individual capacity and official capacity as Director of Student Support and Conduct for Oklahoma State University; DOUG HALLENBECK, in his individual capacity and official capacity as Vice President of Student Affairs for Oklahoma State University; RAJ MURTHY, in his individual capacity and official capacity as Chief Information Officer for Oklahoma State University; JACKSON LANDRUM, in his individual capacity and official capacity as Director of Equal Opportunity for Oklahoma State University; BILLY G. TAYLOR, RICK DAVIS, JIMMY HARREL, JOE HALL, CARY BAETZ, BLAYNE ARTHUR, RICK WALKER, JASON RAMSEY, JAROLD CALLAHAN, and TRUDY MILNER, all in their individual capacities and official capacities as members of the OSU/A&M Board of Regents,<br><br>        *Defendants.* | Case No. __CIV-23-29-J__<br><br>**VERIFIED COMPLAINT** |

     Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

## INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). In theory, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet Oklahoma State and its officials have created a series of rules and regulations that deter, suppress, and punish speech about the political and social issues of the day. These restrictions disregard decades of precedent.

3.      First, the University's harassment policy disciplines students who engage in speech that the University deems to be "intimidat[ing]," "verbal abuse," or other conduct that is "persistent, severe, or pervasive" and "threatens or endangers the mental … health" of another student. The policy gives students no details about what the University considers "abusive" or "intimidating" and covers a wide swath of protected speech. This vague, overbroad, and content-based restriction on protected speech violates the First and Fourteenth Amendments.

4.      Second, the University's computer policy forbids students from using their student email accounts or the University's network to "transmit[] political campaigning." Violations of the computer policy can lead to the loss of privileges and are punishable under the Student Code of Conduct. This policy is similarly an overbroad and content-based restriction on protected speech that violates the First and Fourteenth Amendments.

5.     Third, the University's bias-incidents policy martials the authority of university administrators to police speech that someone believes is motivated by "bias." The University defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is close-minded, prejudicial, or unfair." "Bias incidents," in turn, are formally defined as "actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." Bias incidents can occur on or off campus, including on social media. Students accused of "bias incidents" can be referred for formal disciplinary proceedings. This policy poses a grave risk of chilling the open and unfettered discourse that should be central to higher education. Its bureaucratic processes—and the vague, overbroad, and viewpoint-based definition of "bias incident" that triggers them—violate the First and Fourteenth Amendments.

6.     Speech First has members who attend Oklahoma State and whose protected speech is chilled by these three policies. The policies should be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

7.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

8.     The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

9.     Venue is proper under 28 U.S.C. §1391 because all Defendants reside here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

10.    Plaintiff, Speech First, is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. *E.g.*, *Speech First, Inc. v. Khator*, 2022 WL 1638773 (S.D. Tex. May 19, 2022); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020).

11.    Speech First has members who attend Oklahoma State University, including Students A, B, and C.

12.    Oklahoma State is a public university organized and existing under the laws of Oklahoma.

13.    Defendant Kayshe Shrum is President of the University. Shrum is responsible for the enactment and enforcement of University policies, including the policies challenged here. Shrum is sued in her individual and official capacities.

14.    Defendant Aleigha Mariott is Director of Student Support and Conduct for the University. Mariott is responsible for the enactment and enforcement of University policies, including the policies challenged here. Mariott is sued in her individual and official capacities.

15.    Defendant Doug Hallenbeck is Vice President for Student Affairs at the University. Hallenbeck is responsible for nearly all aspects of student life, including the oversight of the bias-incidents policy, and is the final authoritative interpreter of the scope of

the harassment policy and computer policy. Hallenbeck is sued in his individual and official capacities.

16.     Defendant Raj Murthy is the Chief Information Officer for the University. Murthy is responsible for enforcing the University's informational-technology policies, including the computer policy challenged here. Murthy is sued in his individual and official capacities.

17.     Defendant Jackson Landrum is the Director of Equal Opportunity for the University. Landrum is responsible for enforcing the University's discrimination and harassment policies and bias-incidents policy. Landrum is sued in his individual and official capacities.

18.     Defendants Billy G. Taylor, Rick Davis, Jimmy Harrel, Joe Hall, Cary Baetz, Blayne Arthur, Rick Walker, Jason Ramsey, Jarold Callahan, and Trudy Milner are members of the OSU/A&M Board of Regents. The Board of Regents is the "govern[ing]" authority of the University and is responsible for "supervision, management, and control" of the University, including the policies challenged here. The Board Defendants are all sued in their individual and official capacities.

## BACKGROUND

### I.   College Students and Their First Amendment Rights

19.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus

is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

20.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

21.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

22.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful."

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Fenves*, 979 F.3d at 339.

## II.   Universities' Use of Speech Codes and Bias-Response Teams to Chill Speech

23.    Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities are now more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

24.    One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights and Expression (FIRE), are "university regulations prohibiting expression that would be constitutionally protected in society at large." *Spotlight on Speech Codes 2022* at 9, FIRE, perma.cc/4P23-HJWV.

25.    Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies impose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Id.* at 9; *see Fenves*, 979 F.3d at 338-39 n.17 (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

26.    In addition to speech codes, universities are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams." *See Free Speech in the Crosshairs: Bias Reporting on College Campuses*, Speech First (2022), perma.cc/DX37-LX3F.

27.     Living up to their Orwellian name, bias-response teams encourage students to monitor each other's speech and report incidents of "bias" to the University (often anonymously). "Bias" is defined incredibly broadly and covers wide swaths of protected speech; in fact, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

28.     Students have been reported to bias-response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, at 15-18, FIRE, perma.cc/84NZ-SM2E.

29.     After receiving reports of a bias incident, bias-response teams typically log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend formal or informal discipline.

30.     Although universities claim this process is entirely voluntary, they know students do not see it that way. As the Sixth Circuit has explained, an "invitation from [a bias-response team] to meet could carry an implicit threat of consequence should a student decline the invitation." *Schlissel*, 939 F.3d at 765. Even when "there is no indication that the invitation to meet contains overt threats," the University's disciplinary "referral power lurks in the background." *Id.*

31.     A 2017 report from FIRE found that bias-response teams monitor protected expression and lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." *Bias Response Team Report 2017*, at 28. "[T]he posture taken by many Bias Response Teams," the

study found, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

32.     Other universities have discovered that bias-response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias-response team, citing their "high failure rate" and their tendency to "become almost punitive."

33.     University professors have similarly observed that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Snyder & Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), perma.cc/CS56-LQ7B; *see also* Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias-response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism.").

34.     Courts have likewise recognized the chilling effect of bias-response teams that closely resemble Oklahoma State's. After Speech First challenged similar bias-response teams at the University of Texas, the University of Michigan, and the University of Central Florida, all three schools disbanded their teams. The Sixth Circuit held that Michigan's team imposed

an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. The Fifth Circuit agreed, stressing that Texas's team "represent[ed] the clenched fist in the velvet glove of student speech regulation." *Fenves*, 979 F.3d at 338. The Eleventh Circuit likewise held that "the average college-aged student would be intimidated—and thereby chilled from exercising her free-speech rights— by subjection to [Central Florida's] bias-related-incidents policy." *Cartwright*, 32 F.4th at 1124.

35.     Unsurprisingly, the rise of bias-response teams and speech codes is matched by a parallel rise in the percentage of college students who feel like they cannot express controversial opinions on campus. According to a September 2020 survey of more than 20,000 American college students, an astonishing 42 percent of students believe their university would punish them for making an offensive or controversial statement. *2020 College Free Speech Rankings*, at 19, FIRE (Sept. 2020), perma.cc/TSJ6-HRE7. A separate survey found that, among non-freshman college students, nearly half reported that "sharing ideas and asking questions without fear of retaliation, even when those ideas are offensive to some people," had become "more difficult" in the Fall 2020 semester than in previous semesters. *Campus Expression Survey Report 2020*, at 3, Heterodox Academy (Mar. 2021), perma.cc/6RZA-SUE9.

## III.   The University's Harassment Policy

36.     In September 2022, University officials approved an updated Student Code of Conduct, including a section on "Prohibited Conduct."

37.     The Code of Conduct defines "Prohibited Conduct" as behavior that "detract[s] from the effectiveness of a university community and for which students may be subject to

conduct action." Violations are punishable by "sanctions" that can include "suspension or expulsion from the university."

38.    One form of prohibited conduct is "harassment." Under the header "Social Justice," the University defines "harassment" as "[e]ngaging in verbal abuse, threats, intimidation, harassment, coercion, bullying, or other conduct that threatens or endangers the mental or physical health/safety of any person or causes reasonable apprehension of such harm that is persistent, severe, or pervasive and is subjectively offensive to the complainant and objectively offensive to a reasonable person." The definition of harassment is partially circular, as it includes the term "harassment" itself. Elsewhere, the Code, under the header "Cowboy Community Standards," states that "Social Justice" means that "respecting the dignity of every person is essential for creating and sustaining a flourishing university community" and that students are expected to "act to discourage and challenge those whose actions may be harmful to and/or diminish the worth of others."

39.    The Code also forbids students from "[a]ttempting to or encouraging others to commit acts prohibited by this Code" or displaying "[a]pathy or acquiescence in the presence of prohibited conduct."

40.    According to the University, harassment can occur anywhere, at any time, by any medium. The Code states that it "applies to conduct which occurs on university premises, at Oklahoma State University-sponsored events both on and off campus, and to off-campus conduct that adversely affects the Oklahoma State University community or the pursuit of its objectives." The Code applies to all conduct "from the time of application for admission through the actual awarding of the degree."

41.     Anyone—whether affiliated with the University or not—can file a complaint against a student. The University itself also "may initiate a complaint." The University expects "students, faculty and staff" to "report all violations of the Student Code of Conduct of which they become aware." After a complaint is filed, "Student Support & Conduct will conduct [an] investigation[] to gather information." Students found guilty of harassment are subject to disciplinary action via the student conduct process outlined in the Code. Sanctions for violations "can range from a verbal warning to suspension or expulsion."

## IV.    The University's Computer Policy

42.     In March 2021, the Board of Regents approved a revised version of University Policy 3-0601, titled "Appropriate Use Policy." The computer policy "applies to all University owned or controlled information technology resources whether individually controlled or shared, stand alone or networked."

43.     Students violate the computer policy if they use the University's information technology resources "for transmitting political campaigning" messages.

44.     The policy informs students that they can "report material received via email" by "send[ing] a complaint" to an email hotline operated by the University.

45.     Students must comply with the computer policy to maintain access to the internet network. Because the computer policy is incorporated by reference in the Code of Conduct, violations of the policy are also punishable through the Student Conduct process.

46.     The computer policy's restrictions are consistent with the University's history of suppressing student speech about politics. For example, a 2016 investigation by FIRE found

that the University used a "customizable blacklist" on Facebook to "automatically scrub[]" references to political candidates in the comments sections of its Facebook posts.

## V.   The University's Bias-Incidents Policy

47.   On top of its speech codes, the University has adopted a "bias incidents" policy designed to deter, suppress, and punish disfavored and controversial speech.

48.   The University defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is close-minded, prejudicial, or unfair." A "bias incident," in turn, is defined as "actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics."

49.   The "actions" that the policy covers encompass pure speech. Students can be reported for, among other things, a "Comment in Class," a "Comment in Writing," "Incorrect name or pronoun usage," or an "Offensive Picture or Image." Bias incidents can occur on or off campus, including on social media or other digital platforms.

50.   The University "urges anyone who has experienced or witnessed a bias incident to report it." Bias-incident complaints can be submitted online via a "Bias Incident Report" form on the University's website.  In its advertisements urging students to "report[] concerning behavior," the University lists its "Bias Incident Report" form right next to the forms to "report sexual violence" and report "violations of the Code of Conduct."

51.   Importantly, complaints about biased speech can be submitted anonymously. When reporting biased speech, complainants specify the date and location of the alleged incident and list key details about the "involved parties," including the offender's name, phone

number, and email address. Complainants also can provide a description of the incident and include "supporting documentation" for the complaint, such as "[p]hotos, video [and] email[s]." Complainants further specify whether they were the "[t]arget" of the bias incident, a "[w]itness to the incident," a "[f]riend/[f]amily/[p]artner of the target," or a "University employee." Complainants must also specify whether the "incident [was] reported to a police agency."

52.     The University has created the "Bias-Incident Response Team" or "BIRT" and charged it with responding to bias incidents. The BIRT "[r]eview[s] all reports with due diligence." After receiving a complaint, the BIRT "will contact the reporting person [if possible] and, if desired, offer a meeting to discuss the incident in detail to explore a plan for resolution." The complainant's "[s]uggestions for redress . . . will be considered to the fullest extent of the [BIRT's] authority." The BIRT's goal is to achieve an "informal resolution" to the complaint, such as "training and educational opportunities" for the offender. But "where disciplinary or corrective action is a possibility," bias-incident complaints will be "referred to … Student Conduct." Finally, the BIRT will keep detailed records of the allegations against the offender and the BIRT's response, ostensibly so the University can "assess the campus climate on an ongoing basis."

## VI.     The Effect of the University's Policies on Speech First's Members

53.     Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech covered by the University's harassment policy, computer

policy, and bias-incidents policy, but they credibly fear that the expression of their deeply held views will be considered "biased," "harassing," "unwarranted," "intimidating," and the like.

54.     One Speech First member, Student A, is a Sophomore at the University.

55.     Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

56.     Student A is staunchly opposed to affirmative action and believes it is just old-fashioned racism by another name. She believes that giving preferences to college or job applicants based solely on the color of their skin is immoral and unconstitutional, and that people should be judged on merit, not race.

57.     Student A believes that abortion is wrong and that women should not be allowed to kill innocent babies. She likewise believes that laws that allow a mother and father to decide that a baby should die if its existence is inconvenient have no place in civilized society. She wants to emphasize Planned Parenthood's eugenicist roots and point out that abortion clinics largely target minority women.

58.     Student A is strongly against illegal immigration and wants the government to enforce our immigration laws. She thinks the government should not be using tax dollars paid by hard-working Americans to subsidize in-state tuition benefits for illegal aliens.

59.     Student A also believes that sex is inherent and immutable and that there is no such thing as a "gender spectrum." She thinks the exponential growth in adolescents and young adults who identify as transgender or "non-binary" is evidence that many people now claim a certain "gender identity" because they want attention or affirmation. When gender

identity topics arise in class or in other discussions on campus, Student A wants to highlight this evidence and share her beliefs.

60.     Student A enrolled in the University because she wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

61.     Student A wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

62.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including affirmative action, abortion, gender identity, or immigration, Student A wants to point out the flaws in their arguments and convince them to change their minds.

63.     Student A wants to speak directly to her classmates about these topics, and she wants to talk frequently and repeatedly about these issues. Given her views, she knows that many of these conversations will be heated and passionate. But she wants to have these conversations because she feels strongly about these issues.

64.     Student A speaks about these issues in small circles of friends when she knows that they share her opinions and are unlikely to report her for violating the University's speech policies.

65.     But University's harassment policy and bias-incidents policy make her reluctant to openly express her opinions or have these conversations in the broader University community.

66.     Student A does not fully express herself or talk about certain issues because she believes that sharing her beliefs will be considered "harassment." For example, she believes that others on campus will find her views "offensive" or "intimidat[ing]," especially if she shares those views passionately and repeatedly. Many of the topics that she wants to address could easily be considered "harassment" under the University's policy.

67.     Student A's fears are amplified by the fact that the University can punish her not only for committing "harassment" herself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

68.     Student A also does not fully express herself or talk about certain issues because she knows that students, faculty, or others will likely report her to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student A is confident that someone will find her speech to be "biased." She worries that there are other students who will "catch" her engaging in "biased" speech and that the University will take action against her. For example, Student A is afraid that the Bias Incident Response Team will keep a record on her, share the allegations with others within the university, call her in for meetings, or refer the allegations to the Office of Student Conduct.

69.     Another Speech First member, Student B, is a Junior at the University.

70.     Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

71.     Student B believes that life begins at conception and that abortion is a grave evil. He believes that no one has the right to end an innocent life just because a pregnancy is "unplanned" or "unwanted."

72.     Student B believes that marriage is only between a man and a woman and that children are healthiest when they are raised as part of a nuclear family. Student B is a Christian, and his views on this issue stem partly from his religious beliefs.

73.     For the same reasons, Student B believes it is wrong for two men to use a "surrogate" to carry a baby. He believes that these men are simply "renting" the wombs of women, many of whom are in difficult financial circumstances. When Student B hears other students advocating for "surrogacy rights," he wants to tell them that they are simply advocating for the right to exploit women.

74.     Student B believes that gender dysphoria is a real condition that can occur in rare cases, but that biological sex is immutable and cannot change based on someone's internal feelings or how they "identify." He doesn't want to be forced to affirm that a biological male is actually a female, or vice versa, simply because someone will be offended by his beliefs. When he hears classmates assert that "gender is a social construct," or that "trans women are women," he wants to respond with his belief that biological sex is binary—as it has been throughout human history.

75.     Finally, Student B believes that the Black Lives Matter organization has had a corrosive impact on race relations in America. He doesn't believe that any person is inherently "privileged" due to the color of their skin, or that America is a systemically racist country.

76.     Student B enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

77.     Student B wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

78.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including, abortion, the nuclear family, gender identity, or racial justice, Student B wants to point out the flaws in their arguments and convince them to change their minds.

79.     Student B wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

80.     Student B speaks about these issues in small circles of friends when he knows that they share his opinions and are unlikely to report him for violating the University's speech policies.

81.     The University's harassment policy, bias-incidents policy, and computer policy, however, make him reluctant to openly express his opinions or have these conversations in the broader University community.

82.     Student B does not fully express himself or talk about certain issues because he believes that sharing his beliefs will be considered "harassment." For example, he believes that others on campus will find his views "offensive" or "intimidat[ing]," especially if he shares those views passionately and repeatedly. Many of the topics that he wants to address could easily be considered "harassment" under the University's policy.

83.     Student B's fears are amplified by the fact that the University can punish him not only for committing "harassment" himself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

84.     Student B also does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student B is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student B is afraid that the Bias Incident Response Team will keep a record on him, share the allegations with others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

85.     Finally, Student B wants to send politically-oriented emails—including campaign-related emails—to his fellow students from his university email address. He refrains from doing so, however, because he is afraid that he will be punished under the computer policy's ban on "political campaigning."

86.     Another Speech First member, Student C, is a Junior at the University.

87.     Student C is "politically conservative" and holds political beliefs that are unpopular, controversial, and in the minority on campus.

88.     Student C believes that human beings are created male or female and that a person cannot "transition" from one to the other. He has no ill-will towards members of the LGBT community, but he cannot in good conscience pretend that a biological male is actually

a woman simply because someone believes that to be "his truth." When someone claims that to be the case, Student C wants to politely—but firmly—share his beliefs to the contrary.

89.     Student C is firmly pro-life. He believes that abortion kills a defenseless baby and that elective abortions should be illegal in all circumstances. He believes that many men who claim to be "pro-choice" are really just interested in avoiding the responsibility of fatherhood and living with the consequences of their decisions.

90.     Student C opposes illegal immigration and believes that "open border" policies are destructive and dangerous. He thinks that the government should focus on providing services to men and women who live in this country legally rather than extending already-strained support systems to those who have no right to be here. When other students talk about "undocumented immigrants," Student C wants to point out that they are actually "illegal immigrants"—because they are here illegally.

91.     Student C enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

92.     Student C wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater.

93.     When another a classmate or member of the university community voices contrary views about these and other controversial topics, including, abortion, gender identity, or immigration, Student C wants to point out the flaws in their arguments and convince them to change their minds.

94.     Student C wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

95.     Student C frequently discusses these issues with small circles of classmates who he knows share his views, and also in certain circumstances when he knows a classmate is unlikely to report him for violating University policies.

96.     The University's harassment policy, bias-incidents policy, and computer policy, however, make him reluctant to openly express his opinions or have these conversations in the broader University community, particularly when he thinks other students are likely to report him.

97.     Student C does not fully express himself in certain circumstances or talk about certain issues because he believes that sharing his beliefs will be considered "harassment." For example, he believes that others on campus will find his views "offensive" or "intimidat[ing]," especially if he shares those views passionately and repeatedly. Many of the topics that he wants to address could easily be considered "harassment" under the University's policy.

98.     Student C's fears are amplified by the fact that the University can punish him not only for committing "harassment" himself, but also for being present during someone else's "harassment" in a manner that allegedly shows "apathy or acquiescence."

99.     Student C also does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student

C is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student C is afraid that the Bias Incident Response Team will keep a record on him, share the allegations with others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

100.    Finally, Student C wants to send politically-oriented emails—including campaign-related emails—to his fellow students from his university email address. He refrains from doing so, however, because he is afraid that he will be punished under the computer policy's ban on "political campaigning" if he does.

**COUNT I**
**Violation of the First Amendment**
**(Harassment Policy)**

101.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

102.    The First Amendment prohibits public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A regulation is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected

speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

103.    "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

104.    The University's harassment policy is unconstitutionally overbroad. By its terms, the policy applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody—could be considered "verbal abuse," "intimidation," or causing the "reasonable apprehension" of "harm" to "the mental … health" of a listener.

105.    While a university might be able to prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities

or benefits provided by the school," *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), the University's harassment rule goes far beyond that.

106.   The Supreme Court has also consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

107.   The harassment policy is a content-based restriction on protected speech. The quintessential example of "a content-based regulation" is one that is "justifi[ed]" by "concern for the effect of the subject matter on listeners." *United States v. Playboy Ent. Group*, 529 U.S. 803, 120 (2000). The policy prohibits "verbal" conduct that another student finds "intimidat[ing]" or "abus[ive]." The University has no compelling interest in suppressing the unfettered exchange of political speech. Even if the University could identify a compelling interest, its content-discriminatory ban is not narrowly tailored to furthering that interest, because it "extends beyond harassment that objectively denies a student equal access to [the University's] education resources." *Saxe*, 240 F.3d at 210.

108.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT II
**Violation of the First and Fourteenth Amendments: Void for Vagueness**
**(Harassment Policy)**

109.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

110.    It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) ("A law is unconstitutionally vague if it fails to establish standards for the government and public that are sufficient to guard against the arbitrary deprivation of liberty interests.").

111.    As to the first goal, "'[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) ("The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law."). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Grayned*, 408 U.S. at 108-09).

112.    This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

113.    The harassment policy gives students no guidance about what speech is permitted and what speech isn't. One definition of harassment is, entirely circularly, "harassment." The definition is also subjective, as it covers any "other conduct" that "threatens" another student's "mental … health/safety."

114.    This vagueness creates a serious risk that the policy will be enforced in an arbitrary manner or will be used to target speech based on the viewpoint of the speaker. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614-15 (1971). The University's general disclaimer that it "values and protects the constitutional right of free speech" only exacerbates the vagueness. *See Nat'l People's Action v. City of Blue Island*, 594 F. Supp. 72, 75-79 (N.D. Ill. 1984); *Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1021 (N.D. Cal. 2007); *see also Fenves*, 979 F.3d at 337 (noting that disclaimers "simply reinforce[] the open-ended language" of the policy and the fact that it reaches protected speech); *id.* ("The difficulty with such disavowals is that regulations governing 'rude,' 'uncivil,' 'harassing,' or 'offensive' speech can in fact cover speech otherwise protected by the First Amendment.").

115.    The harassment policy is thus void for vagueness.

116.    Defendants adopted this unconstitutional policy under color of state law.

## COUNT III
## Violation of the First Amendment
## (Computer Policy)

117.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

118.   The University's computer policy prohibits students from using their student email accounts or the University's network to "transmit[] political campaigning."

119.   Violations of the computer policy are punishable under the Code of Conduct and can lead to the loss of network privileges.

120.   The computer policy is a content-based restriction on political speech—a category of expression where the First Amendment has "its fullest and most urgent application." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The University's email accounts and internet networks are traditional public forums, at least for students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that the internet is today's quintessential traditional public forum). Students can and do use these resources for personal and political speech. Content-based restrictions on speech in a traditional public forum must satisfy strict scrutiny. *Summum*, 555 U.S. at 469.

121.   "The First Amendment's hostility to content-based regulation extends … to prohibition of public discussion of an entire topic." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) (cleaned up). For instance, "a law banning the use of sound trucks for political speech— and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* So too here.

122. The University allows students to send emails about any issue of public debate *except* for "political campaigning" issues. That regulation is a classic content-based restriction. For example, the University's policy appears to allow a student to send an email that says "support universal healthcare" but forbids the same student from sending an email that says "re-elect Will Joyce for Stillwater Mayor because he supports universal healthcare." Such distinctions cannot satisfy any level of scrutiny, much less strict scrutiny.

123. Defendants adopted this unconstitutional policy under color of state law.

**COUNT IV**
**Violation of the First Amendment**
**(Bias-Incidents Policy)**

124. Plaintiff repeats and realleges each of the prior allegations in this complaint.

125. The University's definition of a "bias incident" encompasses speech that is fully protected under the First Amendment.

126. The bias-incidents policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot survive strict scrutiny.

127. The policy is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

128. The University openly acknowledges that students can face disciplinary sanctions for committing "bias incidents," which renders the policy unconstitutional on its own. Otherwise, the University would not recognize that the BIRT will refer "the reporter … to Human Resources or Student Conduct" in "the case where disciplinary or corrective action is a possibility." But even when students cannot be formally disciplined, the bias-incident

protocol objectively chills speech by keeping a record of reports, threatening students with negative consequences, and subjecting them to burdensome administrative processes. *See Schlissel*, 939 F.3d 756; *Fenves*, 979 F.3d 319; *Cartwright*, 32 F.4th at 1123.

129.   This overbroad policy chills protected speech and expression.

130.   Defendants adopted this unconstitutional policy under color of state law.

### COUNT V
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Bias-Incidents Policy)

131.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

132.   The bias-incidents policy gives students no guidance about what speech is permitted and what speech isn't, and the policy authorizes arbitrary and discriminatory enforcement.

133.   The policy defines "bias incident" as an "incident [that] involves actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." The policy then defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is closed-minded, prejudicial, or unfair."

134.   The bias-incidents policy encompasses speech and conduct on and off campus, including on social media.

135.   The policy turns on unpredictable assessments about whether student speech is "closed-minded, prejudicial, or unfair." Those terms are undefined and subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332.

136.    The policy provides only examples of how bias "usually" occurs and thus are merely illustrative.

137.    The policy's vague standard deprives students of "a reasonable opportunity to understand what conduct [the policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2002).

138.    The policy also "authorizes or encourages arbitrary and discriminatory enforcement." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 50 (10th Cir. 2013) (cleaned up).

139.    The bias-incidents policy is thus void for vagueness.

140.    Defendants adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.      A declaratory judgment that the University's harassment policy violates the First and Fourteenth Amendments;

B.      A declaratory judgment that the University's computer policy violates the First and Fourteenth Amendments;

C.      A declaratory judgment that the University's bias-incidents policy violates the First and Fourteenth Amendments;

D.      A permanent injunction barring Defendants from enforcing the University's harassment policy;

E.      A permanent injunction barring Defendants from enforcing the University's computer policy;

F.      A permanent injunction barring Defendants from enforcing the University's bias-incidents policy;

G.      A permanent injunction barring Defendants from investigating, logging, threatening, referring, or punishing (formally or informally) students for bias incidents;

H.      A preliminary injunction granting the relief specified above during the pendency of this action;

I.      An order holding Defendants jointly and severally liable for nominal damages in the sum of $1;

J.      Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

K.      All other relief that Plaintiff is entitled to.

Dated: January 9, 2023                    Respectfully submitted,

s/ Ryan Haynie                            /s/ Cameron T. Norris
(Signed by Filing Attorney with           J. Michael Connolly (*pro hac vice* forthcoming)
permission of Attorney)                   Cameron T. Norris
Ryan Haynie, OBA No. 32796                James F. Hasson (*pro hac vice* forthcoming)
1401 N. Lincoln Blvd.                      Thomas S. Vaseliou (*pro hac vice* forthcoming)
Oklahoma City, OK 73104                   CONSOVOY MCCARTHY PLLC
(405) 590-6070                            1600 Wilson Blvd., Suite 700
ryan@ocpathink.org                        Arlington, VA 22209
                                          (703) 243-9423
                                          mike@consovoymccarthy.com
                                          cam@consovoymccarthy.com
                                          james@consovoymccarthy.com
                                          tvaseliou@consovoymccarthy.com

## VERIFICATION

I, Cherise Trump, declare as follows:

1.     I am the Executive Director of Speech First, Inc., the plaintiff in this case.

2.     I have reviewed this complaint.

3.     For the allegations within my personal knowledge, I believe them all to be true.

4.     For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, and C.

5.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2023

_____
Cherise Trump, Executive Director of Speech First, Inc.