**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

SPEECH FIRST, INC.

*Plaintiff,*

v.

KAYSE SHRUM, in her individual capacity
and official capacity as President of
Oklahoma State University, *et al.*,

*Defendants.*

Case No. 5:23-cv-00029-J

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 1

Background ................................................................................................................. 2

   I.  The First Amendment and College Campuses ................................................ 2

   II.  The University's Harassment Policy ................................................................ 5

   III. The University's Computer Policy .................................................................. 6

   IV. The University's Bias-Incidents Policy ........................................................... 7

   V.  Speech First and This Litigation .................................................................... 9

Argument ................................................................................................................. 11

   I.  Speech First is likely to prevail on the merits. ............................................. 12

      A. The harassment policy is an overbroad, vague, content-based restriction on speech. .............................................................................................. 12

      B. The computer policy is an overbroad, content-based restriction on speech. ........... 16

      C. The bias-incidents policy, as enforced by the BIRT, is overbroad and vague .......... 18

   II.  Speech First satisfies the remaining preliminary-injunction criteria. ............................ 22

   III. The Court should not require an injunction bond. ............................................. 23

Conclusion ............................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Am. Commc'ns Ass'n v. Douds,*
   339 U.S. 382 (1950) ...................................................................................19

*Am. Future Sys., Inc. v. Penn. State Univ.,*
   752 F.2d 854 (3d Cir. 1984) .......................................................................16

*Aposhian v. Barr,*
   958 F.3d 969 (10th Cir. 2020) ....................................................................22

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,*
   564 U.S. 721 (2011) ...................................................................................17

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012) .............................................................22, 23

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) .....................................................................................19

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   140 S. Ct. 2335 (2020) .........................................................................15, 17

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ...................................................................................17

*City of Houston v. Hill,*
   482 U.S. 451 (1987) ...................................................................................14

*Coates v. Cincinnati,*
   402 U.S. 611 (1971) ................................................................................4, 16

*Coquina Oil Corp. v. Transwestern Pipeline Co.,*
   825 F.2d 1461 (10th Cir. 1987) ..................................................................23

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't,*
   533 F.3d 780 (9th Cir. 2008) ......................................................................14

*Davis v. Monroe County Board of Education,*
   526 U.S. 629 (1999) .............................................................................12, 13

*DeJohn v. Temple Univ.,*
   537 F.3d 301 (3d Cir. 2008) ..................................................................13, 16

*Doe v. Univ. of Mich.,*
   721 F. Supp. 852 (E.D. Mich. 1989) .............................................................3

*Elrod v. Burns,*
   427 U.S. 347 (1976) ...................................................................................22

*Faustin v. City & Cnty. of Denver,*
   423 F.3d 1192 (10th Cir. 2005) ..................................................................16

*Forsyth Cty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ........................................................................................ 3, 14

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .............................................................................................. 3

*Healy v. James,*
    408 U.S. 169 (1972) ........................................................................................... 1, 3

*Hobby Lobby Stores, Inc. v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) ........................................................................... 22

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) .......................................................................................... 3

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
    993 F.2d 386 (4th Cir. 1993) ............................................................................... 15

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................................................................ 19

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .......................................................................................... 3

*McCauley v. Univ. of V.I.,*
    618 F.3d 232 (3d Cir. 2010) ............................................................................. 4, 16

*Pac. Frontier v. Pleasant Grove City,*
    414 F.3d 1221 (10th Cir. 2005) ........................................................................... 23

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017) ........................................................................................ 16

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ............................................................................................ 16

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................................. 15, 16, 18

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................................. 14, 15, 17

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009) ........................................................................... 23

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001) ........................................................................ 3, 13, 14

*Snyder v. Phelps,*
    562 U.S. 443 (2011) .............................................................................................. 3

*Solid Rock Found. v. Ohio State Univ.,*
    478 F. Supp. 96 (S.D. Ohio 1979) ...................................................................... 1, 3

*Speech First, Inc. v. Cartwright,*
    2021 WL 3399829 (M.D. Fla. July 29, 2021) .......................................................................23

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) .................................................................................passim

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ....................................................................................passim

*Speech First, Inc. v. Khator,*
    2022 WL 1638773 (S.D. Tex. May 19, 2022) ............................................................2

*Speech First, Inc. v. Sands,*
    2021 WL 4315459 (W.D. Va. Sept. 22, 2021) ..........................................................2

*Speech First, Inc. v. Schlissel,*
    939 F.3d 756 (6th Cir. 2019) ....................................................................................passim

*Sweezy v. N.H. ex rel. Wyman,*
    354 U.S. 234 (1957) ..................................................................................................3

*Taylor v. Roswell Indep. Sch. Dist.,*
    713 F.3d 25 (10th Cir. 2013) ....................................................................................15

*United States v. Alvarez,*
    567 U.S. 709 (2012) ..................................................................................................16

*United States v. Hernandez-Calvillo,*
    39 F.4th 1297 (10th Cir. 2022) ................................................................12, 14, 18

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016) ...............................................................12, 22

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ..................................................................................................3

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ..................................................................................19

*Winnebago Tribe of Nebraska v. Stovall,*
    341 F.3d 1202 (10th Cir. 2003) ................................................................................23

**Other Authorities**

Keith Whittington, *Free Speech and the Diverse University,*
    87 Fordham L. Rev. 2453 (2019) ..............................................................................4

## INTRODUCTION

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972) (cleaned up). "The college campus" is supposed to "serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979). But Oklahoma State and its officials have created a series of rules and regulations that restrain, deter, suppress, and punish speech about the political and social issues of the day. These restrictions disregard decades of precedent and violate the First and Fourteenth Amendments.

*First*, the University's harassment policy disciplines students who engage in speech that causes "harm" to the "mental … health [or] safety" of another student. This vague, content-based, and overbroad restriction of protected speech violates the First and Fourteenth Amendments.

*Second*, the University's computer policy forbids students from using its network to "transmit[] political campaigning" messages. Violations of the computer policy can lead to formal discipline. This policy, too, is a vague, overbroad, and content-based restriction on the most protected speech under our Constitution.

*Third*, the University's bias-incidents policy martials the authority of administrators to police speech that others believe is motivated by bias. "Bias incidents" are formally defined as "actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." Examples of bias incidents include, among other things, a "Comment in

1

Class," a "Comment in Writing," "Incorrect name or pronoun usage," and posting an "Offensive Picture or Image." These incidents can occur on or off campus, including on social media and other digital platforms. The University tracks all bias incidents and reserves the right to refer students for formal discipline for engaging in them. Bias-response teams like Oklahoma State's, in effect and by design, are "the clenched fist in the velvet glove of student speech regulation." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 338 (5th Cir. 2020). Their bureaucratic processes—and the vague, overbroad, and viewpoint-based definition of "bias incident" that triggers them—violate the First and Fourteenth Amendments.

Speech First will likely prevail on the merits of these constitutional claims. Its members, who are current students at the University, want to engage in speech prohibited by the University's policies but refrain from doing so because they fear the repercussions. Because Speech First readily satisfies the remaining criteria for a preliminary injunction, this Court should grant its motion and preliminarily enjoin the University from enforcing the challenged policies.[1]

## BACKGROUND

### I.  The First Amendment and College Campuses

The First Amendment "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562

---

[1] *E.g.*, *Speech First, Inc. v. Khator*, 2022 WL 1638773 (S.D. Tex. May 19, 2022) (granting Speech First a preliminary injunction against a university's harassment policy); *Speech First, Inc. v. Sands*, 2021 WL 4315459 (W.D. Va. Sept. 22, 2021) (granting Speech First a preliminary injunction against a university's computer policy); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) (holding that the district court should have granted Speech First a preliminary injunction against a university's harassment policy).

U.S. 443, 452 (2011). Its protections are strongest on the campuses of public colleges and universities. *See Healy*, 408 U.S. at 180; *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957); *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989); *Solid Rock*, 478 F. Supp. at 102. Universities that try to police speech that is "biased," "hateful," "harassing," or "discriminatory" have a poor record in court. A "consistent line of cases" has "uniformly found" such "campus speech codes unconstitutionally overbroad or vague." *Fenves*, 979 F.3d at 338-39 & n.17 (collecting ten cases).

These types of policies are overbroad because they sweep in "a substantial amount of speech that is constitutionally protected." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). There is no First Amendment exception for "harassing" or "discriminatory" speech. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001) (Alito, J.); *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). So policies that regulate this speech impose "'content-based, viewpoint-discriminatory restrictions.'" *Saxe*, 240 F.3d at 206. It is "a core postulate of free speech law" that the government cannot punish speech "based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

Further, these policies are often void for vagueness. The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit policies that use terms so vague that individuals of "ordinary intelligence" have no "reasonable opportunity to know what is prohibited," that lack "explicit standards," or that encourage "ad hoc" or "subjective" enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). This prohibition is even "more stringent" for policies, like college speech codes, that affect "the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Speech codes that rely on loose,

subjective standards are void for vagueness because students cannot know in advance (and administrators can arbitrarily decide) what's prohibited. *See Coates v. Cincinnati*, 402 U.S. 611, 614 (1971); *McCauley v. Univ. of V.I.*, 618 F.3d 232, 250-51 (3d Cir. 2010).

On top of speech codes, universities, like Oklahoma State, are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams." *See* Ex. K. Living up their Orwellian name, these teams encourage students to monitor each other's speech and to report incidents of "bias" to a team of university administrators. Universities and their faculty have noted the chilling effect of such bias-incidents policies. *See, e.g.*, Ex. F; Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias-response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism."). So too have the courts. After Speech First challenged similar bias-response teams at the University of Texas, the University of Michigan, and the University of Central Florida, courts acknowledged that bias-response teams objectively chill student speech, and all three schools disbanded their teams. *See Fenves*, 979 F.3d at 338 (stressing that Texas's team "represent[ed] the clenched fist in the velvet glove of student speech regulation"); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (explaining that "the average college-aged student would be intimidated—and thereby chilled from exercising her free-speech rights—by subjection to [Central Florida's] bias-related-incidents policy"); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (finding that Michigan's bias response team "acts by way of implicit threat of punishment and intimidation to quell speech").

## II.  The University's Harassment Policy

In September 2022, University officials approved an updated Student Code of Conduct, including a section on "Prohibited Conduct." *See* Ex. A at 6-10.[2] The Code of Conduct defines "Prohibited Conduct" as behavior that "detract[s] from the effectiveness of a university community and for which students may be subject to conduct action." Ex. A at 6. Violations are punishable by "sanctions" that can include "suspension or expulsion from the university." Ex. A at 12.

One form of "prohibited conduct" is "harassment." Ex. A at 7. Under the header "Social Justice," the University defines "harassment" as "[e]ngaging in verbal abuse, threats, intimidation, harassment, coercion, bullying, or other conduct that threatens or endangers the mental or physical health/safety of any person or causes reasonable apprehension of such harm that is persistent, severe, or pervasive and is subjectively offensive to the complainant and objectively offensive to a reasonable person." *Id.* The definition of harassment is partially circular, as it includes the term "harassment" itself. The Code also forbids students from "[a]ttempting to or encouraging others to commit acts prohibited by this Code" or displaying "[a]pathy or acquiescence in the presence of prohibited conduct." Ex. A at 6.

According to the University, harassment can occur anywhere, at any time, by any medium. The Code states that it "applies to conduct which occurs on university premises, at Oklahoma State University-sponsored events both on and off campus, and to off-campus conduct that adversely affects the Oklahoma State University community or the pursuit of its

---

[2] "Ex" refers to the exhibits attached to the declaration of James F. Hasson.

objectives." Ex. A at 5. The Code applies to all conduct "from the time of application for admission through the actual awarding of the degree." *Id.*

Anyone—whether affiliated with the University or not—can file a complaint against a student. *See* Ex. A at 11. The University itself also "may initiate a complaint." Ex. A at 11; *see* Ex. C at 2. The University expects "students, faculty and staff" to "report all violations of the Student Code of Conduct of which they become aware." Ex. D at 1; *see* Ex. C at 2. After a complaint is filed, "Student Support & Conduct will conduct [an] investigation[] to gather information." Ex. A at 12. Students found guilty of harassment are subject to disciplinary action via the student conduct process outlined in the Code. *See* Ex. A at 11-19. Sanctions for violations "can range from a verbal warning to suspension or expulsion." Ex. A at 4, 19.

### III.  The University's Computer Policy

In March 2021, the Board of Regents approved a revised version of University Policy 3-0601, titled "Appropriate Use Policy." *See* Ex. G. The computer policy "applies to all University owned or controlled information technology resources whether individually controlled or shared, stand alone or networked." Ex. G at 1, §2.01. Students violate the computer policy if they use the University's information technology resources "for transmitting political campaigning" messages. Ex. G at 2, §4.04B.

The policy informs students that they can "report material received via email" by "send[ing] a complaint" to an email hotline operated by the University. Ex. G at 6. Students must comply with the computer policy to maintain access to the internet network. Ex. G at 2, 8-9. Because the computer policy is incorporated by reference in the Code of Conduct,

violations of the policy are also punishable through the Student Conduct process. *See* Ex. A at 7.

The computer policy's restrictions are consistent with the University's history of suppressing students' online speech about politics. For example, a 2016 investigation by FIRE found that the University used a "customizable blacklist" on Facebook to "automatically scrub[]" references to political candidates in the comments sections of its Facebook posts. Ex. H at 9-10.

### IV. The University's Bias-Incidents Policy

On top of its speech codes, the University has adopted a "bias incidents" policy designed to deter, suppress, and punish disfavored and controversial speech. The University defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is close-minded, prejudicial, or unfair." Ex. I at 1. A "bias incident," in turn, is defined as "actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." Ex. I at 1. The "actions" that the policy covers encompass pure speech. Students can be reported for, among other things, a "Comment in Class," a "Comment in Writing," "Incorrect name or pronoun usage," or an "Offensive Picture or Image." Ex. J at 4-5. Bias incidents can occur on or off campus, including on social media or other digital platforms. Ex. J at 3-4.

The University "urges anyone who has experienced or witnessed a bias incident to report it." Ex. I at 1; *see* Ex. J at 1. Bias-incident complaints can be submitted online via a "Bias Incident Report" form on the University's website. Ex. J. In its advertisements urging students

to "report[] concerning behavior," the University lists its "Bias Incident Report" form right next to the forms to "report sexual violence" and report "violations of the Code of Conduct." Ex. C at 2; *see* Ex. D at 1.

Importantly, complaints about biased speech can be submitted anonymously. Ex. J at 1. When reporting biased speech, complainants specify the date and location of the alleged incident and list key details about the "involved parties," including the offender's name, phone number, and email address. Ex. J at 2-3. Complainants also can provide a description of the incident and include "supporting documentation" for the complaint, such as "[p]hotos, video [and] email[s]." Ex. J at 5-6. Complainants further specify whether they were the "[t]arget" of the bias incident, a "[w]itness to the incident," a "[f]riend/[f]amily/[p]artner of the target," or a "University employee." Ex. J at 5. Complainants must also specify whether the "incident [was] reported to a police agency." *Id.*

The University has created the "Bias-Incident Response Team" or "BIRT" and charged it with responding to bias incidents. Ex. I at 1. The BIRT "[r]eview[s] all reports with due diligence." Ex. I at 2. After receiving a complaint, the BIRT "will contact the reporting person [if possible] and, if desired, offer a meeting to discuss the incident in detail to explore a plan for resolution." *Id.* The complainant's "[s]uggestions for redress … will be considered to the fullest extent of the [BIRT's] authority." *Id.* The BIRT's goal is to achieve an "informal resolution" to the complaint, such as "training and educational opportunities" for the offender. *Id.* But "where disciplinary or corrective action is a possibility," bias-incident complaints will be "referred to … Student Conduct." *Id.* Finally, the BIRT will keep detailed

records of the allegations against the offender and the BIRT's response, ostensibly so the University can "assess the campus climate on an ongoing basis." *Id.*

## V. Speech First and This Litigation

Plaintiff, Speech First, is a nationwide membership organization dedicated to preserving human and civil rights secured by law, including the freedom of speech. Trump Decl. ¶2. Speech First protects the rights of students at colleges and universities through litigation and other lawful means. *Id.* Speech First has brought similar (and successful) challenges against harassment policies, computer policies, and bias-response teams at other universities, including the University of Central Florida, the University of Houston, the University of Michigan, the University of Texas, the University of Illinois, and Iowa State University. *Court Battles*, Speech First, perma.cc/7NST-B84H (last accessed Dec. 2, 2022).

Speech First has members who currently attend the University, including Students A, B, and C. Trump Decl. ¶¶3-4. Students A, B, and C have "views that are unpopular, controversial, and in the minority on campus." Student A Decl. ¶4; Student B Decl. ¶4; Student C Decl. ¶4. For example, Student A believes that "women should not be allowed to kill innocent babies"; "abortion clinics largely target minority women"; the University shouldn't "subsidize in-state tuition benefits for illegal aliens"; and "there is no such thing as a gender spectrum." Student A Decl. ¶¶6-8. Student B believes that "marriage is only between a man and a woman and that children are healthiest when they are raised as part of a nuclear family"; "it is wrong for two men to use a 'surrogate' to carry a baby"; "biological sex is immutable and cannot change based on someone's internal feelings or how they 'identify'"; no one should "be forced to affirm that a biological male is actually a female, or vice versa, simply because

someone will be offended"; and "the Black Lives Matter organization has had a corrosive impact on race relations in America." Student B Decl. ¶¶6-9. And Student C believes that "human beings are created male or female and … a person cannot 'transition' from one to the other"; "'undocumented immigrants' … are actually 'illegal immigrants'—because they are here illegally" and "have no right to be here"; and "abortions should be illegal in all circumstances." Student C Decl. ¶¶5-7.

Students A, B, and C want to "[e]ngage in open and robust intellectual debate with [their] fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Stillwater." Student A Decl. ¶10; Student B Decl. ¶11; Student C Decl. ¶9. When someone else voices contrary views, Students A, B, and C "want to point out the flaws in their arguments and convince them to change their minds." Student A Decl. ¶11; Student B Decl. ¶12; Student C Decl. ¶10. Students A, B, and C want to "speak directly to [their] classmates about these topics" and "talk frequently and repeatedly on these issues." Student A Decl. ¶12; Student B Decl. ¶13; Student C Decl. ¶11.

But the University's harassment policy, computer policy, and bias-incidents policy make them "reluctant to openly express [their] opinions or have these conversations in the broader University community, particularly when [they] think other students are likely to report them." Student A Decl. ¶14; Student B Decl. ¶15; Student C Decl. ¶13. Students A, B, and C "do not fully express [themselves] in certain circumstances or talk about certain issues because [they] believe that sharing [their] beliefs will be considered 'harassment.'" Student A Decl. ¶15; Student B Decl. ¶16; Student C Decl. ¶14. For example, they believe that others on

campus will find their views "offensive" or "intimidat[ing]" under the policy, especially if they share their views passionately and repeatedly. *Id.*

In addition, Students A, B, and C "do not fully express [themselves] or talk about certain issues because [they] know that students, faculty, or others will likely report [them] to University officials for committing a 'bias-related' incident." Student A Decl. ¶17; Student B Decl. ¶18; Student C Decl. ¶16. Because the definition of "bias" is so broad and vague, they are "confident that someone will find [their] speech to be 'biased.'" *Id.* They worry that other students will "catch" them engaging in "biased" speech and that the University will take action against them. *Id.* For example, they are afraid that the BIRT will "keep a record on [them], share the allegations with others within the university, call [them] in for meetings, or refer the allegations to the Office of Student Conduct." *Id.*

Finally, Students B and C "want to send politically-oriented emails—including campaign-related emails—to [their] fellow students from [their] university email address." Student B Decl. ¶19; Student C Decl. ¶17. They refrain from doing so, however, because they are afraid that they will be punished under the computer policy. *Id.*

Speech First brought this suit to ensure that its members and other students will not face discipline, investigation, or any other negative repercussions from the University for their views or their speech. Trump Decl. ¶8.

## ARGUMENT

Speech First is entitled to a preliminary injunction if it shows four things: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor;

and (4) the preliminary injunction is in the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (cleaned up). In free-speech cases, the first factor is often "determinative." *Id.* (cleaned up). When a policy likely violates the First Amendment, the remaining factors usually favor a preliminary injunction. *Id.* That is the case here.

## I.  Speech First is likely to prevail on the merits.

The University's harassment policy, computer policy, and bias-incidents policy likely violate the First and Fourteenth Amendments.

### A.  The harassment policy is an overbroad, vague, content-based restriction on speech.

The University's harassment policy is overbroad. A policy is overbroad when "a substantial number of [the policy's] applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep." *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1301 (10th Cir. 2022) (cleaned up). "Put more concretely, to prove a [policy's] overbreadth (and thus its facially invalidity), the challenger must show that it prohibits a substantial amount of protected speech." *Id.* at 1302 (cleaned up). Here, the University restricts *protected speech*—not just *prohibitable conduct*. The Supreme Court in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), drew a clear line between harassment that is *punishable conduct* and harassment that is *protected speech*. There, the Court interpreted Title IX and defined punishable "harassment" (*i.e.*, prohibited conduct, not protected speech) as behavior that is "so severe, pervasive, and objectively offensive that it denies its victims … equal access to education." *Id.* at 652. The Court's standard intentionally excludes "a single instance of one-on-one peer harassment," even if "sufficiently severe." *Id.* at 652-53. The Court adopted this narrow standard because a

broader one would conflict with the First Amendment. *See id.* at 649-52; *id.* at 667 (Kennedy, J., dissenting).

The University, however, ignores *Davis*'s limits. The University defines "harassment" as "[e]ngaging in verbal abuse … or other conduct that threatens or endangers the mental or physical health/safety of any person or causes reasonable apprehension of such harm that is persistent, severe, or pervasive and is subjectively offensive to the complainant and objectively offensive to a reasonable person." Ex. A at 7. But that definition conflicts with *Davis*'s standard in several ways. First, the policy covers "severe *or* pervasive" harassment, so it necessarily reaches a single or isolated incident that the University deems sufficiently "severe." *Id.* (emphasis added). But *Davis* intentionally excluded single or isolated incidents. *See* 526 U.S. at 652-53 ("so severe, pervasive, *and* objectively offensive" (emphasis added)). Second, the University bans "harassment" that "threatens or endangers the mental … health/safety of any person" or that "causes reasonable apprehension of such harm." Ex. A at 7. But *Davis* made clear that prohibitable harassment must turn on whether the harassment denies someone's access to education. *See* 526 U.S. at 652 ("so severe, pervasive, and objectively offensive that it *denies its victims … equal access to education*" (emphasis added)).

The differences between the University's harassment policy and the *Davis* standard are fatal. *See Khator*, 2022 WL 1638773, at *2 & n.6 ("Speech First will likely succeed on the merits because the original policy does not comport with the standard adopted by the Supreme Court [in *Davis*].”). The University has no legitimate basis to go beyond *Davis*'s limits. *See Fenves*, 979 F.3d at 337 n.16; *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008). That's especially true here because the University's policy "strikes at the heart of moral and political discourse—the

lifeblood of constitutional self government (and democratic education) and the core concern of the First Amendment." *Saxe*, 240 F.3d at 210. Moreover, given that the University's policy covers single or isolated incidents, the policy's "plain language is 'susceptible of regular application to protected expression,' reaching vast amounts of protected speech uttered daily." *Hernandez-Calvillo*, 39 F.4th at 1313 (quoting *City of Houston v. Hill*, 482 U.S. 451, 466 (1987)). In short, the harassment policy is unconstitutionally overbroad.

The harassment policy also discriminates by content. A policy "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A policy can be content-based "on its face" or because of its "purpose and justification." *Id.* at 166. Both apply here.

The policy is facially content-based. The policy's definition of "harassment" hinges on the listener's *subjective* response to the speech. That's because "harassment" can occur when speech "causes reasonable apprehension" to a person and is "subjectively offensive to the complainant." Ex. A at 7. And it's well-established that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty.*, 505 U.S. at 134; *see also, e.g., Saxe*, 240 F.3d at 209 ("The Supreme Court has made it clear, however, that the government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that its offensive content may have on a listener."); *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008) ("If the statute … would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'"). That alone makes the policy content-

based. *See Reed*, 576 U.S. at 165 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." (cleaned up)).

The policy's purpose and justification also prove that the policy is content-based. The harassment definition is under the header of "Social Justice." Ex. A at 7. The policy's purpose and justification are thus to "single[] out specific subject matter for differential treatment." *Reed*, 576 U.S. at 169. So the policy is content-based, regardless whether it "target[s] viewpoints within that subject matter." *Id.*

The harassment policy thus is subject to strict scrutiny. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("Content-based laws are subject to strict scrutiny."). The University must "prove[] that [the policy is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. It cannot. The University has no legitimate interest in drafting its policy this way, let alone a compelling one. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395-96 (1992); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993). Nor is the policy narrowly tailored. The policy fails strict scrutiny.

The harassment policy is also unconstitutionally vague. "A policy may be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 50 (10th Cir. 2013) (cleaned up). Here, the policy bars speech that creates a "reasonable apprehension" of "harm" to the "mental … health [or] safety" of

another student. But these terms are undefined and undefinable. Worse, whether an individual "reasonabl[y]" believes that certain speech might pose a risk to his or her mental "health" or "safety" is wholly subjective. *See McCauley*, 618 F.3d at 250-51; *DeJohn*, 537 F.3d at 317-20; *Coates*, 402 U.S. at 614; *see also Cartwright*, 32 F.4th at 1121 ("Both terms—'unreasonably' and 'alter[]'—are pretty amorphous, their application would likely vary from one student to another." (alteration in original)). The policy's definition of "harassment" is also circular; it defines "harassment" as "harassment." Ex. A at 7; *see Fenves*, 979 F.3d at 332 ("Terms[,] like 'harassment,' … beg for clarification."). For these reasons, the policy's "deterrent effect on legitimate expression is 'both real and substantial.'" *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1202 (10th Cir. 2005). And that is a hallmark of an unconstitutionally vague policy. No average student would understand what the policy prohibits, and the subjective nature of the terms encourages arbitrary and discriminatory enforcement.

### B.  The computer policy is an overbroad, content-based restriction on speech.

The University's computer policy fares no better. The challenged provisions regulate speech—for example, "electronic mail" messages. *See generally* Ex. G. The University's email accounts and internet networks are traditional public forums for students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that the internet is today's quintessential traditional public forum). In a traditional public forum, "any restriction based on the content of the speech must satisfy strict scrutiny." *Pleasant Grove City v. Summum*, 555

U.S. 460, 469 (2009); *accord United States v. Alvarez*, 567 U.S. 709, 717 (2012); *R.A.V.*, 505 U.S. at 382.

The University lets students send emails about any issue of public debate except "political campaigning." Ex. G at 3, §4.04B. But "[t]he First Amendment's hostility to content-based regulation extends … to prohibition of public discussion of an entire topic." *Reed*, 576 U.S. at 169. For example, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* So too here. A student can send an email that says "universal healthcare is a human right" but not an email that says "re-elect Senator James Lankford." That is classic content discrimination. *See Barr*, 140 S. Ct. at 2346 ("Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech.").

The University has no legitimate interest in maintaining such a policy. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (cleaned up). For this reason, "the First Amendment has its fullest and most urgent application to speech uttered during [and for] a campaign for political office." *Id.* (cleaned up); *see also Citizens United v. FEC*, 558 U.S. 310, 339-40 (2010); *Cartwright*, 32 F.4th at 1125.

Moreover, the policy's ban on "political campaigning" emails is overbroad. From its face, the policy bans emails advocating for the election or defeat of specific candidates, emails advocating for issues that are typically aligned with a certain party, and emails advertising a student government campaign. Plus, the policy provides only "examples" of prohibited

17

conduct and thus is merely illustrative. *See* Ex. G at 2, §4.01 ("Within the following sections, *examples* of acts or omissions, *though not covering every situation*, are included …." (emphases added)). The computer policy is thus "susceptible of regular application to protected expression, reaching vast amounts of protected speech uttered daily." *Hernandez-Calvillo*, 39 F.4th at 1313 (cleaned up). That is, it "restricts political advocacy and covers substantially more speech than the First Amendment permits." *Cartwright*, 32 F.4th at 1125.

### C.  The bias-incidents policy, as enforced by the BIRT, is overbroad and vague.

The University's policy on bias incidents, as enforced by its bias-response team, suffers from similar constitutional infirmities. The definition of "bias incident" expressly covers speech: "A bias incident involves actions committed against or directed toward a person or property that are motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics." Ex. I at 1. And the policy defines "bias" as "a disproportionate weight in favor of or against an idea or thing, usually in a way that is closed-minded, prejudicial, or unfair." *Id.* This definition encompasses both on-campus and off-campus conduct. *See* Ex. J at 3-4.

The policy is unconstitutionally overbroad and vague. To start, the policy is content- and viewpoint-based. It targets speech "committed against … a person" and that is "motivated, in whole or in part, by a bias against a person or group of persons who possess common characteristics," Ex. I at 1; *see R.A.V.*, 505 U.S. at 391-93. And the policy's definition of "bias incident" turns on unpredictable assessments about whether student speech is "closed-minded, prejudicial, or unfair." Ex. I at 1. Those terms are undefined and subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332. The policy also suggests that its definitions

are merely illustrative, reinforcing the policy's overbreadth and vagueness. *See* Ex. I at 1 ("*usually* in a way that is closed-minded, prejudicial, or unfair" (emphasis added)). This alone dooms the policy.

The University will likely assert that the BIRT cannot *directly* discipline students for committing bias incidents, but that assertion is neither true nor relevant. The Supreme Court has long understood that policies that "fall short of a direct prohibition" still violate the First Amendment when they objectively chill speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). And the Court, along with many circuits, have explained that objective chill can occur through "[i]nformal measures" such as "indirect 'discouragements,'" "'threat[s],'" "'coercion, persuasion, and intimidation.'" *White v. Lee*, 227 F.3d 1214, 1228 & n.8 (9th Cir. 2000) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963), and *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950)). As the Eleventh Circuit recently said about another bias-response team, "[Supreme Court and circuit precedent] demonstrate a commonsense proposition: Neither formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights—indirect pressure may suffice." *Cartwright*, 32 F.4th at 1123.

The right question is thus "whether the average college-aged student would be intimidated—and thereby chilled from exercising her free-speech rights—by subjection to the bias-related-incidents policy and the [bias-response team's] role in enforcing it." *Id.* at 1124. The answer—as three circuits have held—is yes. *See id.* at 1122-24 (University of Central Florida's Bias Response Team); *Fenves*, 979 F.3d at 333 (University of Texas's Campus Climate Response Team); *Schlissel*, 939 F.3d at 765 (University of Michigan's Bias Response Team).

The Fifth, Sixth, and Eleventh Circuits reached that conclusion for four reasons, all of which apply here:

**First**, the bias-incidents protocol "acts by way of implicit threat of punishment and intimidation to quell speech." *Id.* From start to finish, the policy is designed to send a clear message to students: If you engage in a "bias incident," you are in trouble. *Cf. Cartwright*, 32 F.4th at 1124 n.5 (explaining that the "tenor" of a similar bias policy was "if your speech crosses our line, we will come after you"). The names "bias incident" and "bias response team" "suggest[] that the accused student's actions have been prejudged to be [unjust]" and "could result in far-reaching consequences." *Schlissel*, 939 F.3d at 765; *accord Cartwright*, 32 F.4th at 1124. The policy's terminology—*e.g.*, "bias," "incident," "target," and "disciplinary or corrective action," *see* Ex. I at 1; Ex. J at 4-5—also suggests serious misconduct, *see Schlissel*, 939 F.3d at 765 ("Nobody would choose to be considered biased."); *Fenves*, 979 F.3d at 338 ("The CCRT describes its work, judgmentally, in terms of 'targets' and 'initiators' of incidents."). "No reasonable college student wants to run the risk of being accused of" being biased, closed-minded, prejudicial, or unfair. *Cartwright*, 32 F.4th at 1124. "Nor would the average college student want to run the risk that the University will" create a dossier of everything she says or does. *Id.*; *see* Ex. I at 2 (the BIRT will "[e]nsure reported bias incidents are properly recorded so that they may assess the campus climate on an ongoing basis").

**Second**, the University's practice of "urg[ing]" anonymous reporting "carries particular overtones of intimidation to students whose views are 'outside the mainstream.'" *Fenves*, 979 F.3d at 338; *see* Ex. I at 1. Because bias incidents are addressed by high-level university officials, including the Director of Student Support & Conduct, a student "could be forgiven for

thinking that inquiries from and dealings with [University administrators] could have dramatic effects such as currying disfavor with a professor, or impacting future job prospects." *Schlissel*, 939 F.3d at 765. Experts thus agree that these teams objectively chill students' speech. *See generally* Exs. E, H, K; *see also* Verified Compl. ¶¶31-35; *Fenves*, 979 F.3d at 338.

  ***Third***, "the breadth and vagueness of the bias-related-incidents policy exacerbates the chill that the average student would feel." *Cartwright*, 32 F.4th at 1124. As noted above, the definitions of "bias" and "bias incident" are open-ended and ill-defined. The Bias Incident Form's list of conduct that the University anticipates will be reported only underscores the point. The University expects reports for conduct ranging from "incorrect name or pronoun usage," "harassment," and "verbal assault" to "property damage/destruction," "theft of property," and even "physical assault." Ex. J at 2 (cleaned up). And it expects reports for both on-campus and off-campus conduct. *See* Ex. J at 3-4 (listing options to report a student for comments in class, comments made in a classroom assignment, and comments via email or social media). In essence, the University expects (indeed, encourages) anything and everything to be reported. "Pair th[e] broad, vague, and accusatory language with the task-force-ish name of the investigating organization—the [Bias Incident] *Response Team*—and … it is clear that the average college student would be intimidated, and quite possibly silenced, by the policy." *Cartwright*, 32 F.4th at 1124.

  ***Finally***, the University's bias-response team has the power to refer bias-incident reports to disciplinary authorities. *See* Ex. I at 2 ("In the case where disciplinary or corrective action is a possibility the reporter will be referred to Human Resources or Student Conduct."). These referrals can "*lead* to" formal discipline and, at a minimum, "initiate[] the formal

investigative process, which itself is chilling." *Schlissel*, 939 F.3d at 765; *accord Fenves*, 979 F.3d at 333.

In sum, the University's entire protocol for addressing bias incidents "is sufficiently proscriptive to objectively chill student speech." *Id.* Speech First is thus likely to succeed on this claim as well.

## II. Speech First satisfies the remaining preliminary-injunction criteria.

Because Speech First is likely to prevail on its constitutional claims, it meets the other criteria for a preliminary injunction. *See Verlo*, 820 F.3d at 1126.

*Irreparable Harm:* The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc). Without a preliminary injunction, Speech First will suffer ongoing First Amendment violations and thus irreparable harm. *See Cartwright*, 32 F.4th at 1128 ("[I]n the absence of a preliminary injunction, Speech First would undoubtedly suffer irreparable harm— … 'the sine qua non of injunctive relief.'").

*Balance of Harms and Public Interest:* "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). "Delayed implementation of a measure that does not appear to address any immediate problem will generally not cause material harm, even if the measure were eventually found to be constitutional and enforceable." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (cleaned up); *see Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (A state actor "is in no way harmed by issuance of a preliminary injunction which prevents the state

from enforcing restrictions likely to be found unconstitutional." (internal quotation marks omitted)). It "is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (cleaned up); *see Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."). And that is especially true where, as here, the constitutional right, "serves significant societal interests." *Cartwright*, 32 F.4th at 1128 (cleaned up). These factors strongly favor a preliminary injunction.

### III.  The Court should not require an injunction bond.

District courts have "have wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (cleaned up). The Court should use its discretion and waive any bond because there is "an absence of proof showing a likelihood of harm" in the event of an injunction. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (cleaned up); *see also Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987). "Delayed implementation of a measure that does not appear to address any immediate problem will generally not cause material harm, even if the measure were eventually found to be constitutional and enforceable." *Awad*, 670 F.3d at 1132. So the Court should not require a bond. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 2021 WL 3399829, at *7 n.11 (M.D. Fla. July 29, 2021) (waiving bond).

**CONCLUSION**

The Court should grant Speech First's motion and preliminarily enjoin Defendants from enforcing the challenged policies during this litigation.

Date: January 10, 2023

Respectfully submitted,

*s/ Ryan Haynie*
(Signed by Filing Attorney with
permission of Attorney)
Ryan Haynie, OBA No. 32796
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

/s/ *Cameron Norris*
J. Michael Connolly (*pro hac vice* forthcoming)
Cameron T. Norris
James F. Hasson (*pro hac vice* forthcoming)
Thomas S. Vaseliou (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com