## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SPEECH FIRST, INC.

*Plaintiff*,

v.

KAYSE SHRUM, in her individual capacity and official capacity as President of Oklahoma State University, *et al.*,

*Defendants*.

**Case No. CIV-23-29-J**
**Evidentiary Hearing and**
**Oral Argument Requested**

## RESPONSE OF DEFENDANT KAYSE SHRUM TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Respectfully submitted,

s/Steve Stephens
Steve Stephens, OBA #10479
Clinton W. Pratt, OBA #21329
Gaylan Towle II, OBA #32884
Kinsey Wyatt, OBA #32778
Lyman G. Lenker, IV OBA #33219
Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges
5th Floor, Student Union Building
Stillwater, OK 74078
(405) 744-6494 (phone)

**ATTORNEYS FOR DEFENDANT,**
**KAYSE SHRUM IN HER OFFICIAL**
**CAPACITY AS PRESIDENT OF**
**OKLAHOMA STATE UNIVERSITY**

Respectfully submitted,

s/Michael Burrage (with permission)
Michael Burrage, OBA #1350
Reggie Whitten, OBA #9576
J. Renley Dennis, OBA #33160
Austin R. Vance, OBA #33294
Whitten Burrage
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
(405) 516-7800 (phone)

**ATTORNEYS FOR DEFENDANT,**
**KAYSE SHRUM IN HER**
**INDIVIDUAL CAPACITY**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..............................................................................ii, iii

I.    INTRODUCTION .................................................................................... 1

II.   BACKGROUND AND SUMMARY OF ARGUMENT......................... 2

    A. OSU's Commitment to Freedom of Expression ........................... 2

    B. Definition of "Harassment" in the Student Code .......................... 8

    C. OSU's Bias Incident Response Team ......................................... 10

    D. Commencement of the OSU and Board Processes for Revising OSU Policy 3-0601 § 4.04(B) ................................................................ 12

III.  ARGUMENT ......................................................................................... 14

    A. Plaintiff Is Unlikely to Prevail on the Merits ............................. 16

        i.   Plaintiff Lacks Standing .................................................. 16

        ii.  Regardless of Standing, Plaintiff Would Still Not Prevail on the Merits of Its Claims ......................................................... 17

            1.  The challenged policies and practices are constitutional ...... 17

              a.  The definition of "harassment" in the Student Code is not overbroad and/or vague ........................................ 18

              b.  OSU's BIRT does not implicate the First Amendment ................................................................................. 19

    B. Additional Factors Weigh against a Preliminary Injunction ...................... 20

IV.   CONCLUSION ..................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

CASES

*Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854 (3d Cir. 1984) ............................. 23

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009) ................... 15

*Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460 (7th Cir. 2007)........................ 23

*Broadrick v. Okla.*, 413 U.S. 601 (1973).......................................................................... 17

*Bryant v. Indep. Sch. Dist. No. 1-38 of Garvin Co., Okla.*, 334 F.3d 928 (10th Cir. 2003) ............................................................................................................................. 18, 19

*Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767 (2nd Cir. 1984)........................... 21

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) .......................... 8, 9, 10, 18, 19

*First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136 (10th Cir. 2017) .................... 15, 20

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016).............................................................. 15

*Gorman v. Univ. of R.I.*,  837 F.2d 7 (1st Cir. 1988).......................................................... 23

*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250 (10th Cir. 2003) ......................... 14

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ................................ 21, 22

*Hill v. Colo.*, 530 U.S. 703 (2000)................................................................................... 17

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986) ......................................................................................................... 16, 17

*Laird v. Tatum*, 408 U.S. 1 (1972) .................................................................................. 19

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .................................................................. 14

*Meese v. Keene*, 481 U.S. 465 (1987) .............................................................................. 19

*Messeri v. DiStefano*, 480 F. Supp. 3d 1157 (D. Colo. 2020)......................................... 22

*N.M. Dep't of Game and Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236 (10th Cir. 2017) ............................................................................................................................. 21

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004).......................................................................................................................... 15, 16

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017) .......................................... 22

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234 (10th Cir. 2001) ....... 21, 22

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) ...................................................................... 17

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ................................... 15, 21

*Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484 (8th Cir. 1993) 21

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ....................................... 1

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) .................................................. 1

*Speech First, Inc. v. Khator*, CV H-22-582, 2022 WL 1638773 (S.D. Tex. May 19, 2022) ....................................................................................................................... 1, 2

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020) .......................................... 1, 14

*Speech First, Inc. v. Sands*, No. 7:21-cv-203 (W.D. Va. Sept. 22, 2021) .................... 1, 14

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ............................................. 1

*Speech First, Inc. v. Wintersteen*, No. 4:20-CV-2, 2020 WL 6131393 (S.D. Iowa Feb. 25, 2020) ....................................................................................................................... 2

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .......................... 14

*Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669 (D.C. Cir. 1985) .................................. 21, 22

## STATUTES AND RULES

70 O.S. § 2120 ...................................................................................................................... 7

34 C.F.R. § 106.30 ................................................................................................................ 9

State Ethics Rules by the Oklahoma Ethics Commission, Rule 2.14 ............................... 12

## I.    INTRODUCTION

Plaintiff, Speech First, Inc. ("Speech First" or "Plaintiff"), initially sued each member of the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges (each a "Regent" and collectively the "Board"), which governs Oklahoma State University ("OSU"), and multiple administrators at OSU, including President Kayse Shrum ("President Shrum" or "Defendant"), asserting claims against those defendants in their representative and individual capacities. By agreement of the parties, all Regents and named OSU administrators (except President Shrum) were dismissed as defendants without prejudice, with the stipulation that "any injunctive or declaratory relief or attorney's fees awarded in this action to Plaintiff against Defendant Kayse Shrum will apply to and be binding on Oklahoma State University." Dkt. No. 5.

At issue are challenges to OSU's (1) definition of "harassment" in its Student Code of Conduct (the "Student Code"), (2) use of a Bias Incident Response Team (the "BIRT") to address reported incidents of bias, and (3) Policy 3-0601 § 4.04 (the "Appropriate Use Policy"), a computer use policy, as it pertains to students' use of their institutional email addresses (@okstate.edu) to send emails transmitting political campaigning messages. This is not the first case Plaintiff has filed challenging similar policies and processes on university campuses—in fact, since May of 2018, Plaintiff sued the presidents and other officials at seven (7) other public universities.[1] Plaintiff followed a fairly scripted and

---

[1] *See e.g.*, *Speech First v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); *Speech First v. Killeen*, 968 F.3d 628 (7th Cir. 2020); *Speech First v. Fenves*, 979 F.3d 319 (5th Cir. 2020); *Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022); *Speech First v. Sands*, No. 7:21-cv-203, 2021 WL 4315459 (W.D. Va. Sept. 22, 2021), *appeal filed* (No. 21-2061); *Speech*

formulaic path, *slightly* refining arguments in each new case. In those cases, Plaintiff made *generalized* complaints about *non-specific* incidents, attempting to portray each campus environment as hostile to conservative student speech.

However, Plaintiff's standardized approach presents a fictionalized campus setting that simply does not exist at OSU. This Response will set the record straight regarding OSU's clear commitment to freedom of expression and will provide a more accurate depiction of the OSU campus and its efforts to *promote*—not restrict—free speech.

## II.   BACKGROUND AND SUMMARY OF ARGUMENT

### A. OSU's Commitment to Freedom of Expression

The Foundation of Individual Rights and Expression ("FIRE"), the preeminent First Amendment watchdog group in the country, conducted a student survey of over 200 major universities for the 2022–2023 academic year to "identify the best and worst campuses for free speech in the United States." FIRE 2022–2023 College Free Speech Rankings (the "FIRE Rankings"), attached hereto as Exhibit 1, at p. 25. The FIRE Rankings "are based on a composite score of 10 subcomponents." *Id.* at p. 6. According to the overall FIRE Rankings, ***OSU ranked nationally as the fifth-best university surveyed for promoting an atmosphere conducive to free speech.*** *See id.* at p. 11. Furthermore, as to the specific subcomponent relating to students' "comfort expressing ideas," ***OSU ranked second***. *See id.* at p. 13. Thus, FIRE's objective evaluation presents

---

*First v. Khator*, CV H-22-582, 2022 WL 1638773 (S.D. Tex. May 19, 2022); *see also Speech First v. Wintersteen*, No. 4:20-CV-2, 2020 WL 6131393 (S.D. Iowa Feb. 25, 2020) (Resistance filed by Wendy Wintersteen, President of Iowa State University Science and Technology, in response to Speech First's Motion for Preliminary Injunction).

a ***drastically*** different picture than the fictionalized campus atmosphere chilling conservative student speech—in the middle of Oklahoma, one of the most conservative[2] states in the nation, no less—Plaintiff alleges exists.

As delineated in greater detail below, OSU, as a public institution of higher education, is committed to protecting, promoting, and facilitating free expression. The core of this commitment is announced clearly by OSU's governing Board in its policy regarding use of institutional facilities for free expression purposes:

> The Board and its institutions recognize and protect free inquiry and free Expression as indispensable components of the critical examination of philosophies and ideas. Given the unique mission of public educational institutions in a democratic society, this inquiry should be open and vigorous, and should consequently have greater protection than in society at large, provided that such inquiry does not infringe upon the rights of others. Commitment to free inquiry and Expression creates a strong presumption against prohibition of Expression based upon its content.

Declaration of Douglas Hallenbeck, attached hereto as Exhibit 3, at ¶ 5 and Ex. 3-A. OSU's institutional policy concerning use of its facilities echoes this same overarching commitment to free expression established by the Board. *See id.* at ¶ 6 and Ex. 3-B.

Additionally, OSU educates its campus community, particularly students, through a website (the "Free Speech Page") maintained by the Division of Student Affairs. *See* Hallenbeck Decl. at ¶ 7 and Ex. 3-C. On the Free Speech Page, OSU provides information regarding free expression, providing in part: "OSU values and protects the constitutional right of free speech. Through this, we seek to provide all members of the OSU community

---

[2] *See* 2022 Cook Partisan Voting Index (Cook PVI[sm]) at https://www.cookpolitical.com/cook-pvi/2022-partisan-voting-index/state-map-and-list, excerpt attached hereto as Exhibit 2.

with the broadest possible latitude to speak, write, listen, challenge and learn." *Id.* Furthermore, under the heading "Controversial and Offending Speech," the Free Speech Page states: "The right to engage in the aforementioned types of expression is a protected right under our laws, and court rulings exist that articulate offensive speech and unpopular viewpoints are what need legal protection most." *Id.* at ¶ 8 and Ex. 3-C.

The Free Speech Page adds the following unequivocal statement: "There's no constitutional right to not be offended. Controversial speech is expected and valued on college campuses and in our society, which means free speech protection still applies if a speaker is shouting derogatory comments or a social media post is offensive to a particular population." Hallenbeck Decl. at ¶ 9 and Ex. 3-C. Lastly, the Free Speech Page also explains the parameters of OSU's role with respect to expression:

> The university may not inhibit free speech by making direct or implicit threats of sanctions for engaging in protected speech. If the university is notified of an individual or a group of individuals who are expressing remarks that could be interpreted as offensive or hateful, but do not otherwise run afoul of the law concerning free speech the university cannot take conduct action.

*Id.* at ¶ 10 and Ex. 3-D.

In addition, the OSU campus is home to numerous student organizations, which collectively cover a broad range of viewpoints and interests. *See* Declaration of Aleigha Mariott, attached hereto as Exhibit 4, at ¶ 8. In fact, "[s]everal student groups on campus represent the same viewpoints the anonymous students allege they are fearful of expressing," including Turning Point USA, OSU Students for Life, Free Enterprise Society, College Republicans, and many Christian and/or church-affiliated groups. *See id.*

These groups have, on countless occasions, reserved space for tabling, displays, exhibits, and meetings in a very public forum on campus without incident or repercussion of any kind. *See* Declaration of Adam Barnes, attached hereto as Exhibit 5, at ¶ 5. Indeed, "since 2014, groups expressing pro-life and anti-abortion views have reserved space more than 100 times." *Id.* OSU has never denied a reservation or funding for a student group based on its viewpoint, and no one in any student group "expressing views similar to those held by the anonymous students has been or would be referred for discipline." *See id.* at ¶¶ 6–7; *see also* Mariott Decl. at ¶ 8. No student in any group at OSU has ever been referred for discipline for expressing ***any*** viewpoint. *See* Barnes Decl. at ¶ 7; *see also* Mariott Decl. at ¶ 8.

OSU also "routinely has conservative, and often controversial, preachers and speakers arrive on campus to speak in the outdoor public spaces on campus," including, for example, Sister Cindy, Matt Bourgalt, and Danny Washington, all of whom "have spoken on library lawn on multiple occasions." Barnes Decl. at ¶ 8. These "well-known religious conservative speakers . . . often criticize LGBTQ students, other religions, abortions, liberal political thought and progressive social ideas." *Id.* If one of these speakers comes to campus, the Student Union Meeting and Conference Services office "emails a group of campus administrators requesting they monitor the situation to ensure the safety of the speaker and the crowds they typically attract." *Id.* Other "conservative groups often come to campus unannounced." *Id.* at ¶ 9. Less than two weeks ago, in fact, "a group held an anti-abortion protest in front of the OSU library." *Id.* and Ex. 5-A. Consistent with its commitment to diverse expression and viewpoints, OSU has not "denied access to a public

forum or asked [a speaker] to leave campus based upon the content of their speech" or "disciplined or referred for discipline [any student] for expressing views similar to or counter to those of any speaker on campus." *Id.* at ¶¶ 10–11.

OSU has also hosted many other speakers and lecturers in an effort "to encourage robust discussion among students by introducing viewpoints and ideas that may be different from their own." Hallenbeck Decl. at ¶ 13. Those events and speakers include, but are not limited to: George W. Bush, the Republican former President, as the Spring 2006 commencement speaker; Laura Bush, the Republican former First Lady, as the keynote speaker at the Women for OSU Symposium on May 13, 2016; Republican Oklahoma Governor Kevin Stitt as the Fall 2019 commencement speaker; Lauren Bush Lauren, the great-granddaughter of George H.W. Bush, the Republican former President, as the keynote speaker for Honoring Philanthropy and Scholarship at the Women for OSU Symposium on August 31, 2022; and Frank Lucas, Republican U.S. Congressman from Oklahoma, as the Fall 2022 commencement speaker. *Id.*

Another example of OSU's steadfast devotion to free expression is the Stockton/Brooks Lecture (the "Lecture") held in the OSU Student Union just four (4) months ago in October of 2022. *See Stockton/Brooks Lecture Advocates for Free Speech, Not Agreeable Speech*, Oklahoma State University News and Media (Oct. 19, 2022), https://news.okstate.edu/articles/arts-sciences/2022/stockton-brooks-lecture-advocates-for-free-speech-not-agreeable-speech.html (last visited Feb. 7, 2023) (attached hereto as Exhibit 6); *see also* Hallenbeck Decl. at ¶ 13. The Lecture included "discussions of free speech, the effects of cancel culture and the opportunity to exchange ideas and views in an

exuberant environment." Ex. 6. Former OSU student and 2017 Nobel Peace Prize nominee Charles "Chic" Dambach helped coordinate the event in an effort "to advocate for students' voices and to challenge viewpoints." *Id.* Mr. Dambach "want[ed] individuals to be motivated to understand people's ways of thinking, especially when they disagree with others' ideals." He remarked:

> I am offended by those things too[.] But if that is what people are thinking, I want to know what they are thinking and why they think that way. And I want to engage in a dialogue with them. So that is what the free speech movement was all about then and is all about now.

*Id.* The Lecture included a presentation "address[ing] what the boundaries within free speech are and who decided them" by Alex Morey, the director of Campus Rights Advocacy at FIRE. *Id.*; *see also* Hallenbeck Decl. at ¶ 13. Further, during the Lecture's panel discussion, Dr. Joey Senat, a panelist and an associate professor in OSU's School of Media and Strategic Communications, commented, "If you believe in free speech, you often have to advocate for someone's right to say something that you don't agree with— that you believe is dangerous." Ex. 6.

OSU also offers periodic trainings for employees "explaining the parameters of the First Amendment and reiterating OSU's obligations to uphold the First Amendment on campus." Hallenbeck Decl. at ¶ 11 and Ex. 3-E; *see also* Mariott Decl. at ¶¶ 6–7. These trainings "review[] the types of speech protected under the First Amendment, including hate speech." Hallenbeck Decl. at ¶ 11 and Ex. 3-E. Furthermore, pursuant to 70 O.S. § 2120, "[a]ll institutions of higher education in Oklahoma are required by state law to prepare an annual report that incudes any reports of barriers or disruptions of free speech."

*Id.* at ¶ 12 and Ex. 3-F. "For the four calendar years the report has been required, OSU has had no instances of reports of barriers or disruptions to free speech to include in the report." *Id.* and Ex. 3-F.

### B. Definition of "Harassment" in the Student Code

A proper analysis should begin with this important commonality:  Both Plaintiff and OSU want free speech on campus. However, Plaintiff desires it for conservative students, while OSU wants it for *all* students regardless of their political ideals and beliefs. As a free-speech advocate, Plaintiff's focus is solely on free speech, while OSU has a parallel duty to not only preserve and promote free speech, but to also provide a safe environment for the entire campus community. If OSU fails to provide the latter, it can face liability for failure to prevent certain incidents of student-on-student harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999).

The "harassment" definition of which Plaintiff complains is embedded in the Student Code. *See* Student Code of Conduct, excerpt attached hereto as Exhibit 7, at II(19). The Office of Student Support and Conduct (the "OSSC") within the Division of Student Affairs "is responsible for serving students experiencing challenges through a holistic approach of providing support services and administering the Student Code . . . ." Mariott Decl. at ¶ 9; Hallenbeck Decl. at ¶ 14. At any time, "[a]ny member of the OSU community may make a report to the OSSC about a student's behavior"—importantly, "[i]f the report is about a student's speech and does not allege any accompanying behavior that would violate the Student Code, OSSC takes no conduct action." Mariott Decl. at ¶ 14. At OSU, "[m]any reports are made to OSSC on which no action is taken because the alleged conduct,

even if true, does not rise to the level of a violation of the Student Code." *Id.* Since the implementation of the "harassment" definition in August of 2015, only thirteen (13) students "have been found responsible" for violating that provision of the Student Code. *Id.* at ¶ 12. Each of those "incidents involved more than just speech, typically physical violence or threats of physical violence," as "[n]o student has been disciplined for speech alone, regardless of content." *Id.*

The *Davis* case, discussed hereinafter in greater detail, sets forth a standard when public educational institutions may be legally liable for student-on-student bullying and harassment claims. That must be a central focus of this case as well. OSU has an affirmative duty to maintain *and* enforce policies designed to both protect against harmful student-on-student conduct and not infringe upon the constitutional rights of its students. The *Davis* Court ruled liability for sexual harassment under Title IX *could* exist if the plaintiff proved, among other things, the sexual harassment was "**so severe, pervasive, and objectively offensive** that it can be said to deprive the victim of access to educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650 (emphasis added).

Indeed, the Student Code has a separate section utilizing the *Davis* language to specifically define *sexual* harassment. *See* Ex. 7 at II(27)(b). Notably, this specific definition is mandated by federal law. *See* 34 C.F.R. § 106.30. However, sexual harassment is not the only type of harassment that can exist on a college campus. OSU could face liability for, and thus must protect students from, harassment recognizable under several laws, including Title VI, the Rehabilitation Act, ADA, ADEA, and other federal and state laws.

Here, the challenged provision of the Student Code describes multiple types of proscribed conduct under the general heading of "Harassment":

> Engaging in verbal abuse, threats, intimidation, harassment, coercion, bullying, or other conduct that threatens or endangers the mental or physical health/safety of any person or causes reasonable apprehension of such harm that is **persistent, severe, or pervasive and is** subjectively offensive to the complainant and **objectively offensive to a reasonable person**.

Ex. 7 at II(19) (emphasis added). This section contains the "severe, pervasive and objectively offensive" standard set forth in *Davis*. Moreover, there has not been a single incident of disciplinary action taken against a student advocating the viewpoints which Students A, B, and C purportedly want to discuss. *See* Mariott Decl. at ¶ 13. Those viewpoints simply do not violate the Student Code. *Id.* Additionally, Students A, B, and C have not alleged their desire to threaten, intimidate, bully, or even direct their speech or actions at another individual. Instead, they merely wish to "engage in open and robust intellectual debate with their fellow students." Dkt. No. 3-1 at p. 10. Such speech unequivocally does not fit into the definition of proscribed conduct set forth in the Student Code.

### C. OSU's Bias Incident Response Team

Although not the product of a formal policy, OSU implemented its BIRT "in the fall of 2020 with the primary charge of supporting individuals who have experienced a bias incident." Mariott Decl. at ¶ 16; Hallenbeck Decl. at ¶ 20. Importantly, the BIRT is "not an investigative or disciplinary body," as explicitly outlined on its website. Mariott Decl. at ¶ 17 and Ex. 4-A; Hallenbeck Decl. at ¶ 21 and Ex. 3-G. When a student reports an alleged incident of bias to the BIRT, a member of the BIRT contacts "the reporting party

to request further information and discuss available support options," such as counseling services. Mariott Decl. at ¶ 19. When an incident is reported, the BIRT educates the reporter on the "First Amendment and the limitations on OSU's ability to take disciplinary action for speech." *Id.* at ¶ 20. The discussions with the reporting student are strictly voluntary. *Id.*

If the reporting student requests, the BIRT reaches out "to the person alleged to have engaged in the perceived biased behavior." Mariott Decl. at ¶ 20. The BIRT makes checking in on and supporting "the ***student reported to have engaged in the biased conduct*** . . . ***a priority***, just as much as providing support to the reporting student." *Id.* (emphasis added). At this stage, the BIRT clearly informs the student that "the discussion is entirely voluntary and the student is not required to participate." *Id.* In offering these discussions, the "purpose . . . is to support the student as well as educate the student about how their actions impacted the reporting student, not to discipline the student or force the student to change their behavior." *Id.* While BIRT retains records of reports made to it "for the purpose of assessing trends and climate on campus," these "reports are maintained separately from disciplinary records, are not a part of any student's official record and are not provided to anyone outside of OSSC unless specifically requested by the student." Mariott Decl. at ¶ 23.

The BIRT's goal is to help students achieve a deeper understanding of one another. OSU's philosophy for the BIRT is to try to seize the teachable moment to *educate*, not discipline. *See* Mariott Decl. at ¶ 20. To date, the BIRT has received only 29 reports of alleged bias, a majority of those relating to "perceived offensive speech." *Id.* at ¶ 18. No

speech-related incident—or any other incident for that matter—reported to the BIRT has *ever* "resulted in the initiation of disciplinary proceedings or sanctions" against a student. *Id.* at ¶ 21; *see also* Hallenbeck Decl. at ¶ 22.

Plaintiff decries the usefulness of OSU's BIRT and has challenged similar processes at other universities, essentially bragging that it has coaxed other universities into dropping their respective bias response teams altogether. Plaintiff would apparently have OSU do nothing when one of its students, for example, allegedly directs racist remarks at another student, which may inflame or hurt such other student. Regardless of Plaintiff's desire for indifference, OSU believes ignoring those incidents is fundamentally wrong and undercuts its educational mission.

### D. Commencement of the OSU and Board Processes for Revising OSU Policy 3-0601 § 4.04(B)

Plaintiff also attacks OSU's Appropriate Use Policy, which generally governs both students and employees. It is a violation of state law for state employees to use state-owned computers and accompanying state-issued email addresses for political purposes:

> No state officer or employee shall use a state-owned telephone, state electronic mail or other state equipment, property or services to advocate the election or defeat of a clearly identified candidate for any elective office or a vote for or against a state question or any other question to be voted upon at an election.

Rule 2.14, State Ethics Rules by the Oklahoma Ethics Commission (codified at 74 O.S. Chapter 62, App'x 1) (attached hereto as Exhibit 8). Section 4.04(B) of the Appropriate Use Policy is meant only to codify this legal principle in OSU policy. *See* OSU Policy 3-0601 – Appropriate Use Policy, attached hereto as Exhibit 9. However, the prohibition on

"us[ing] the University's information technology resources for transmitting *political campaigning* [content]" (emphasis added) in § 4.04(B) does not appear to ever have been directed at regulating students. *See* Hallenbeck Decl. at ¶ 24; Mariott Decl. at ¶ 25. Rather, it was meant solely to reiterate employees' legal obligations as state personnel. Nonetheless, § 4.04(B) admittedly does not make that distinction clear, and the potential interpretation crafted by Plaintiff would likely run afoul of the First Amendment.

The fact of the matter is OSU *does not* monitor student emails for content, and OSU has never disciplined or reported any student whatsoever for transmitting political campaign materials from a student email account. *See* Declaration of Raj Murthy, attached hereto as Exhibit 10, at ¶¶ 4–5; Hallenbeck Decl. at ¶ 25; Mariott Decl. at ¶ 26. In other cases filed by Plaintiff involving examination of a potentially violative policy, some universities quickly amended such policies and then argued the issue was moot and no longer justiciable. This tactic was successful in some cases; in others, it was unsuccessful, as Plaintiff argued the policies could easily be reenacted after the litigation ended. OSU wants to promote free political speech for its students, regardless of where such speech falls on the spectrum of political beliefs—the far left, far right, or anywhere in between. Thus, OSU plans to remove the specific provision in § 4.04(B) arguably restricting student political expression with respect to transmissions by students from OSU's IT resources, including, but not limited to, their institutional email addresses. OSU's present dilemma is this: *What is the best way to make this change?*

Following extensive and thoughtful deliberation, OSU has commenced the process to amend the Appropriate Use Policy to remove that restriction. *See* Murthy Decl. at ¶ 6;

Hallenbeck Decl. at ¶ 26; Mariott Decl. at ¶ 27. Pursuant to OSU's specific process for policy revisions, this will take a matter of weeks, not days, to occur, and then the Board must formally approve the revised policy. The process to amend § 4.04(B) is underway and will continue to completion, regardless of whether the Court sustains President Shrum's separate Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) (the "12(b)(1) Motion"), filed simultaneously with this Response Brief. In the unlikely event the Court does not sustain President Shrum's 12(b)(1) Motion, hopefully the revisions to § 4.04(B) of the Appropriate Use Policy will have been formally approved by the Board by the time of any hearing on Plaintiff's Motion for a Preliminary Injunction, and this Court will agree with the rationale of prior courts[3] that this issue is moot.

## III.   ARGUMENT

A preliminary injunction is an extraordinary and drastic remedy requiring an applicant to unequivocally show it is entitled to such relief. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *see also Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003) (noting "the right to [a preliminary injunction] must be clear and unequivocal") (citation omitted). This remedy is "never awarded as of right," *Winter*, 555 U.S. at 24, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation marks omitted).

---

[3] *See Killeen*, 968 F.3d at 645–47; *Sands*, No. 7:21-cv-203, at *17–18.

To prevail, Plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the threatened injury outweighs any harm that will result if an injunction is granted; and (4) the grant of an injunction is not adverse to the public interest. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (citing *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016)).

Importantly, there are three types of preliminary injunctions "specifically disfavored" by the Tenth Circuit, and in all three types, a plaintiff must meet a heightened burden when demonstrating the four elements for issuance of a preliminary injunction. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). Those three types are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* If a plaintiff's request falls into one of these enumerated categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* The purpose of a heightened burden in these cases "is to minimize any injury that would not have occurred but for the court's intervention." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).

Here, Plaintiff's requested relief—a preliminary injunction preventing President Shrum (and therefore OSU) from following and enforcing the challenged policy provisions—unreasonably disturbs the status quo. As outlined above, OSU is obligated by law to protect against harmful student-on-student conduct, and as an institution of higher

15

education, OSU must protect its primary function of providing a safe learning environment and campus community for its students. OSU has **never** applied any of the challenged policy provisions in a manner that could possibly result in disciplinary action against Students A, B, and C for their desired speech, and in fact, speech alone has never been cause for discipline at OSU. *See* Hallenbeck Decl. at ¶¶ 17, 19, 22–23, 25; Mariott Decl. at ¶¶ 8, 12–13, 15, 18, 21–22, 26.

A preliminary injunction preventing OSU from following its policies in a manner meant to uphold the very essence of its primary function as a public institution of higher education when, as here, such policies proscribe **nothing** to prevent the anonymous students from engaging in "open and robust intellectual debate with their fellow students" is patently unreasonable in its alteration of the status quo. Therefore, Plaintiff must meet the heightened burden by "mak[ing] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on [the Tenth Circuit's] modified likelihood-of-success-on-the-merits standard." *O Centro*, 389 F.3d at 975–76. Here, Plaintiff cannot meet its burden for **any** of the four prerequisites.

### A. Plaintiff Is Unlikely to Prevail on the Merits

#### i. Plaintiff Lacks Standing

Since Plaintiff seeks a preliminary injunction on behalf of its members, it must demonstrate it has associational standing to sue by showing "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Union,*

*United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282

(1986).

Here, Speech First does not have appropriate standing to sue. President Shrum

submitted this argument to the Court in her 12(b)(1) Motion, filed simultaneously with this

Response Brief. Because the 12(b)(1) Motion challenges Speech First's standing to bring

this action, and thus the Court's jurisdiction to hear Plaintiff's Motion for a Preliminary

Injunction, the Court must first consider and rule upon the 12(b)(1) Motion. If this Court

sustains the 12(b)(1) Motion, as it should, this action cannot proceed further.

### ii.  Regardless of Standing, Plaintiff Would Still Not Prevail on the Merits of Its Claims

#### 1.  The challenged policies and practices are constitutional

Even putting standing aside, Plaintiff's overbreadth and vagueness claims have no

likelihood of success. An overbreadth challenge can succeed "only when the statute is

substantially overbroad, *i.e.*, when the statute is unconstitutional in a substantial portion of

the cases to which it applies." *Regan v. Time, Inc.*, 468 U.S. 641, 650 (1984). Striking down

a policy as overbroad is "strong medicine" to be administered "sparingly and only as a last

resort." *Broadrick v. Okla.*, 413 U.S. 601, 613 (1973). To succeed on a vagueness

challenge, a plaintiff must show the challenged policy "fails to provide people of ordinary

intelligence a reasonable opportunity to understand what conduct it prohibits" or that it

"authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colo.*,

530 U.S. 703, 732 (2000). Plaintiff's claims would fail under these standards.

### a. The definition of "harassment" in the Student Code is not overbroad and/or vague

As referenced above, OSU can face liability for failure to prevent certain incidents of student-on-student harassment. *See Davis*, 526 U.S. 629. The *Davis* case involved allegations by parents that their fifth-grade daughter was sexually harassed by a male student for several months. The parents sought monetary damages against the local school board. The Supreme Court framed the issue before it as "whether a recipient of federal education funding may be liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student harassment." *Id.* at 639. The Court ruled such liability *could* exist if the plaintiff proved: (1) the school was deliberately indifferent to sexual harassment; (2) the school had actual knowledge of the harassment; and (3) the harassment was "**so severe, pervasive, and objectively offensive** that it can be said to deprive the victim of access to educational opportunities or benefits provided by the school." *Id.* at 650 (emphasis added). This definition of "harassment" related specifically to allegations of *sexual* harassment under Title IX.

While OSU's Student Code has a separate section utilizing the *Davis* language to specifically define *sexual* harassment, other types of harassment exist, from which OSU must also protect its students pursuant to state and federal law. OSU recognizes the *Davis* language defining sexual harassment was also utilized by the Tenth Circuit in a Title VI "deliberate indifference" claim involving an allegedly hostile environment caused by repeated racist slurs, epithets, and symbols. *See Bryant v. Indep. Sch. Dist. No. 1-38 of Garvin Co., Okla.*, 334 F.3d 928 (10th Cir. 2003). However, nothing in *Davis* and/or *Bryant*

suggests this *precise* language is the *only* constitutional definition of "harassment" that can exist.

Under the general heading of "Harassment," the challenged provision of the Student Code enumerates several types of proscribed conduct, but in any case, such conduct is not actionable unless it "is *persistent, severe, or pervasive and* is subjectively offensive to the complainant *and objectively offensive to a reasonable person*." Ex. 7 at II(19) (emphasis added). There is nothing constitutionally inadequate, vague, or ambiguous about the proscribed conduct identified in this section that can give rise to disciplinary action pursuant to the Student Code. The Student Code contains the standard set forth in both *Davis* and *Bryant*, and there has not been a single incident of disciplinary action taken against a student advocating the viewpoints which Students A, B, and C purportedly want to discuss. Further, the "OSSC has no authority to impose discipline or sanctions on a student for any action that is not in violation of the Student Code, nor can OSSC impose discipline or sanctions without following the full process set forth in the Student Code." Mariott Decl. at ¶ 11; Hallenbeck Decl. at ¶ 16. Thus, the Student Code's proscription of "harassment" is constitutionally valid.

### b. OSU's BIRT does not implicate the First Amendment

OSU's BIRT does not implicate the First Amendment because the BIRT proscribes *nothing* and has no authority to punish *anyone*. *See Meese v. Keene*, 481 U.S. 465, 480 (1987); *see also Laird v. Tatum*, 408 U.S. 1, 11 (1972) (no cognizable First Amendment claim when alleged "chilling effect" arose from perception that program at issue was

"inappropriate," and not from any "regulations, proscriptions, or compulsions" to which challengers were subject). As explained in greater detail above, the BIRT process is entirely voluntary. *See* Mariott Decl. at ¶¶ 19–20, 22; Hallenbeck Decl. at ¶ 23. Moreover, a student's decision not to respond to the BIRT or to decline a meeting is of no consequence. *See* Mariott Decl. at ¶ 22 ("No student has ever been or would ever be disciplined for declining to participate in the process," and "[i]f a student does not respond, no further attempts are made to reach the student and no further action, disciplinary or otherwise, is taken."). Furthermore, the BIRT is not utilized in any punitive manner whatsoever—the BIRT has no ability to sanction or punish students for engaging in speech or anything else. *See id.* at ¶¶ 17, 20–21. Although Plaintiff also attacks the definitions of "bias" and "bias incident" as they pertain to the BIRT process, this contention misses the mark and is of no consequence because the BIRT operates as a ***voluntary, non-punitive*** process. Regardless, OSU uses the current definitions of "bias" and "bias incident" to provide an outlet for ***all*** students—including students expressing the ***same*** viewpoints as Students A, B, and C—to report incidents. Therefore, the BIRT does not implicate, let alone violate, the First Amendment.

### B.  Additional Factors Weigh against a Preliminary Injunction

Plaintiff also fails to meet its burden with respect to the remaining three factors.

*First*, "the single most important prerequisite for the issuance of a preliminary injunction" is "a showing of probable irreparable harm . . . ." *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141. To successfully satisfy this prong of the preliminary injunction analysis, a plaintiff's alleged irreparable "harm 'must be both certain and great' and not 'merely

serious or substantial.'" *N.M. Dep't of Game and Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). Further, the alleged injury must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citing *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original) (brackets, citations, and internal quotation marks omitted). Plaintiff falls back on the presumption that ***any*** deprivation of a First Amendment right constitutes irreparable harm. But Plaintiff has not shown it likely that OSU violated, or in the future will violate, First Amendment rights—therefore, irreparable harm cannot be presumed. Importantly, "'[p]urely speculative harm will not suffice' to satisfy the burden of showing irreparable injury," *N.M. Dep't of Game and Fish*, 854 F.3d at 1250 (quoting *RoDa*, 552 F.3d at 1210), and yet, that is all Plaintiff offers here.

*Second*, Plaintiff cannot show the balancing of harms favors extraordinary relief. When a defendant "voluntarily take[s] remedial action," a request for injunctive relief is "wholly unnecessary." *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (citing *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir. 1984)). As illustrated above, OSU is presently engaged in the specific institutional and Board processes to amend the Appropriate Use Policy to remove any perceived restriction on student political speech therein. Regardless of whether the Court sustains President Shrum's 12(b)(1) Motion, OSU will see this revision process through to completion.

Moreover, as for the BIRT, OSU does not use it "to deter, suppress, and punish disfavored and controversial speech." *See* Dkt. No. 3-1 at p.7. Thus, the purported harm to Plaintiff is merely speculative. *See Heideman*, 348 F.3d at 1189 (emphasis added) (quoting *Wisconsin Gas Co.*, 758 F.2d at 674; *accord Prairie Band*, 253 F.3d at 1250) ("To constitute irreparable harm, an injury must be certain, great, actual 'and *not theoretical*.'"). With respect to the "harassment" definition in the Student Code, since Students A, B, and C desire only "open and robust intellectual debate" and give no indication they wish to specifically direct their desired speech at another individual for the purpose of threats or intimidation, their speech does not fit into the definition of proscribed conduct set forth in the Student Code. Specifically, the provision on "harassment" *clearly does not* proscribe expression of the viewpoints which Students A, B, and C purportedly want to discuss— evidenced by the fact there has not been a single incident of disciplinary action taken against a student for such views or expression. Only thirteen (13) students "have been found responsible" for committing "harassment" as defined in the Student Code, but *every single one* of those "incidents involved more than just speech, typically physical violence or threats of physical violence," as "[n]o student has been disciplined for speech alone, regardless of content." Mariott Decl. at ¶ 12.

Plaintiff's alleged harm is based upon pure speculation. In contrast, Plaintiff's requested relief *would* cause substantial injury to OSU and its community. Universities have a "strong interest in the educational process, including maintaining a safe learning environment for all its students." *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1168 (D. Colo. 2020) (citing *Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017)

(internal quotations omitted)); *see also Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 467 (7th Cir. 2007) (providing that universities have substantial interest in "being allowed to manage their affairs and shape their destiny free of minute supervision by federal judges and juries" and in "maintain[ing] an atmosphere conducive to learning"); *Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 865 (3d Cir. 1984) ("There can be no doubt that a public university has a significant interest in carrying out its educational mission, and that this interest necessarily gives it some power to regulate its students' lives."); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 14 (1st Cir. 1988) ("Although the protection of [a student's private interest] would require all possible safeguards, it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education."). The Student Code's proscription of "harassment," which does not restrict any of the anonymous students' desired speech, is a vital tool for OSU to utilize in providing a safe learning environment for its students. Further, the BIRT ensures OSU understands and serves the needs of its large and diverse community, connecting students with important resources in times of need while cultivating an environment in which students of all political and social perspectives thrive because they feel safe and supported.

*Third*, Plaintiff's request for relief would be adverse to the public interest. Prohibiting OSU from enforcing policies designed to prevent and respond to unlawful discriminatory harassment or from providing resources to students who feel victimized by bias ***certainly*** does not serve the public interest. Should OSU's policies be enjoined, it will be at the expense of students who are most vulnerable on campus, and OSU's educational mission will suffer as a result.

**IV.    CONCLUSION**

As outlined in detail above, Plaintiff failed to demonstrate a "clear and unequivocal" right to the "extraordinary and drastic remedy" of a preliminary injunction, as Plaintiff has not carried its burden to show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the threatened injury outweighs any harm that will result if an injunction is granted; and (4) the grant of an injunction is not adverse to the public interest. Accordingly, President Shrum requests this Court deny Plaintiff's Motion for a Preliminary Injunction.

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of February, 2023, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Court Clerk will transmit a Notice of Electronic Filing to the following ECF registrants:

J. Michael Connolly (*pro hac vice*)
Cameron T. Norris
James F. Hasson (*pro hac vice*)
Thomas S. Vaseliou (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

**ATTORNEYS FOR PLAINTIFF**

Ryan Haynie, OBA No. 32796
1401 N. Lincoln Blvd.
Oklahoma City, OK 73104
(405) 590-6070
ryan@ocpathink.org

**ATTORNEY FOR PLAINTIFF**

s/Steve Stephens
Steve Stephens